# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**

Filed: February 9, 2026

```
* * * * * * * * * * * * *
GINGER PAHOS,                      *
                                   *
            Petitioner,            *          No.17-1455V
                                   *
v.                                 *          Special Master Gowen
                                   *
SECRETARY OF HEALTH                *
AND HUMAN SERVICES,                *
                                   *
            Respondent.            *
* * * * * * * * * * * * *
```

*David J. Carney,* Green & Schafle LL, Philadelphia, PA, for petitioner.
*Debra A. Filteau Begley,* U.S. Department of Justice, Washington, D.C., for respondent.

## DECISION DISMISSING PETITION[1]

On October 5, 2017, Ginger Pahos ("petitioner") filed her claim in the National Vaccine Injury Compensation Program[2], alleging that the influenza ("flu") vaccine she received on October 8, 2014, caused her to suffer from neuromyelitis optica ("NMO"). Petition (ECF No. 1). After a review of the medical records, medical experts' opinions, medical literature, and an entitlement hearing, I find that petitioner has failed to demonstrate by a preponderant of evidence that she is entitled to compensation, and her petition must be dismissed.

## I.    Procedural History

Petitioner filed her claim on October 5, 2017, alleging that the flu vaccination she received on October 8, 2014, caused her to suffer neuromyelitis optica. Petition. Petitioner also

---

[1] Pursuant to the E-Government Act of 2002, *see* 44 U.S.C. § 3501 note (2012), because this decision contains a reasoned explanation for the action in this case, I am required to post it on the website of the United States Court of Federal Claims. The court's website is at http://www.uscfc.uscourts.gov/aggregator/sources/7. **This means the decision will be available to anyone with access to the Internet.** Before the decision is posted on the court's website, each party has 14 days to file a motion requesting redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). "An objecting party must provide the court with a proposed redacted version of the decision." *Id.* **If neither party files a motion for redaction within 14 days, the decision will be posted on the court's website without any changes.** *Id.*

[2] The National Vaccine Injury Compensation Program is set forth in Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755, codified as amended, 42 U.S.C. §§ 300aa-10 to 34 (2012) (hereinafter "Vaccine Act" or "the Act"). Hereinafter, individual section references will be to 42 U.S.C. § 300aa of the Act.

filed medical records to accompany her claim. *See* Petitioner's Exhibits ("Pet'r. Exs.") 1-10. (ECF No. 5).

On September 12, 2018, respondent filed the Rule 4(c) report recommending against compensation. Respondent Report ("Resp't. Rept.") (ECF No. 20). Petitioner filed an expert report from Justin Willer, M.D.[3] on February 19, 2019. Pet'r. Ex. 12 (ECF No. 24). Respondent filed a responsive expert report from Dr. Subramniam Sriram[4] on June 3, 2019. Resp't Ex. A (ECF No. 28).

The undersigned held a Rule 5 status conference on August 7, 2019, in which I ordered petitioner to file a supplemental expert report and gave respondent the option to engage in litigative risk settlement negotiations or file an additional expert report. Rule 5 Order (ECF No. 29).

Petitioner filed another report from Dr. Justin Willer and respondent filed supplemental expert reports from Dr. Thomas Forsthuber[5] and Dr. Sriram. *See* Pet'r Ex. 21; Resp't Exs. C, E. After which, petitioner filed an expert report from Dr. Lawrence Steinman.[6] Pet'r Ex. 33 (ECF

---

[3] Dr. Justin Willer is a board-certified neurologist. Pet'r. Ex. 47 (ECF No. 75). He received his medical degree from The Chicago Medical School in 1987 is board certified to practice medicine in New York, New Jersey, and Florida. *Id.* at 3. After medical school, Dr. Willer was a resident in neurology at Mount Sinai Hospital Medical Center in New York and did fellowships at the University of Miami International Center for Epilepsy and SUNY Health Science Center in at Brooklyn in EMG/Neuromuscular Diseases. *Id.* at 3. He is board certified in psychiatry and neurology with an added qualification for Clinical Neurophysiology. *Id.* at 2. Dr. Willer has been an Assistant Professor of Clinical Neurology at State University of New York, HSC at Brooklyn and a neuromuscular consultant at the STAR Clinic at State University of New York, HSC at Brooklyn. *Id.* Dr. Willer has co-authored numerous articles regarding neurological conditions. *Id.* at 3-4. Dr. Willer maintains a private neurology practice in New York City. Tr. 80. He has testified as an expert in the Vaccine Program prior to this case. *Id.* The undersigned admitted Dr. Willer as an expert in neurology. Tr. 81.

[4] Dr. Subramaniam Sriram is board-certified neurologist. Resp't. Ex. J. He received his medical degree from the University of Madras in Madras, India and became a medical intern and resident at Wayne State University in Detroit, Michigan. *Id.* at 1. He is board certified in internal medicine and psychiatry and neurology. *Id.* Dr. Sriram is licensed to practice medicine in California, Vermont, and Tennessee. *Id.* At the time of the hearing, Dr. Sriram was a Professor of Experimental Neurology at Vanderbilt University Medical Center in Nashville, Tennessee. *Id.* at 2. Prior to his position at Vanderbilt University, Dr. Sriram was a professor at the University of Vermont in Neurology and Cell Biology. *Id.* at 1. Dr. Sriram has co-authored numerous articles regarding different neurological conditions, including demyelinating conditions. *Id.* at 9-21. Dr. Sriram was admitted as an expert in neurology and neuroimmunology. Tr. 222.

[5] At the time of the hearing, Dr. Thomas Forsthuber was a professor of immunology at the University of Texas at San Antonio in Texas and he is an Endowed Chair in Biotechnology at USTA. Resp't. Ex. I (ECF No. 65); Tr. 287. Dr. Forsthuber received his medical degree from the University of Tubingen in Germany. *Id.* at 1. He passed various United States Licensing examinations, including in basic medical sciences, clinical sciences, and he received his Ohio medical license. *Id.* From 1991-1998, Dr. Forsthuber was a resident in pathology at the University Hospitals in Cleveland, OH. *Id.* In 2005, Dr. Forsthuber became a Professor of Immunology at the University of Texas at San Antonio, in San Antonio, TX. *Id.* at 3. Dr. Forsthuber has authored numerous articles on immunology. *Id.* at 23-31. Dr. Forsthuber was admitted as expert in the field of immunology. Tr. 291.

[6] Dr. Lawrence Steinman is a board-certified neurologist and is the Incumbent of GA Zimmerman Chair as Professor of Neurological Sciences, Neurology, and Pediatrics at Stanford University. Pet'r. Ex. 49. Dr. Steinman received his medical degree from Harvard University and was a resident at Stanford University Hospital. *Id.* at 1.

2

No. 43).  The undersigned held another status conference in this matter and directed petitioner to transmit a demand to respondent.  Scheduling Order (ECF No. 48).  After unsuccessful settlement negotiations, both parties filed additional expert reports.  *See* Pet'r Exs. 36; Resp't Exs. F, G.

An entitlement hearing was held November 16, 2022, where Dr. Justin Willer and Dr. Lawrence Steinman testified on behalf of petitioner and Dr. Thomas Forsthuber and Dr. Subramaniam Sriram testified on behalf of respondent.  After the entitlement hearing, the parties filed post-hearing briefs.  *See* Pet'r Post-Hearing Brief ("Pet'r Br.") (ECF No. 87); Resp't Post-Hearing Brief ("Resp't Br.") (ECF No. 90).

This matter is now ripe for adjudication.

II.    **Summary of Facts**

a.  **Medical Records**

1.  **Prior to Vaccination Medical Record Summary**

Prior to receiving the flu vaccine at issue, petitioner, a fifty year old nurse,  went to her primary care physician on September 17, 2014 for treatment for a swollen right ear.  Pet'r Ex. 5 at 18.  Petitioner reported having a swollen right ear with erythema that started three days prior. *Id.* Additionally, petitioner had an elevated temperature and a tender lymph node.  *Id.*  Petitioner was diagnosed with cellulitis of the right ear and given a prescription for an antibiotic, Cephalexin.  *Id.*

Petitioner was also seeking treatment at the Physicians Neck and Back Center for lower back pain.  *See generally* Pet'r. Ex. 4.  On July 31, 2014, a record titled, "Initial Exam: Lumbar Report," stated that petitioner's primary concern was "low back pain," and that she has experienced lower back pain for 15 years.  Pet'r. Ex. 4 at 1.  Petitioner's gait was recorded as normal and her lower extremity motor exam strength was normal.  *Id.* at 3.  It was recommended that petitioner engage in a short, active rehabilitation program to restore her to "optimal functioning."  *Id.* at 4.

On August 21, 2014, petitioner had a re-evaluation appointment after 7 sessions and it was noted that her pain in her back had improved, but that she could still benefit from additional sessions.  *Id.* at 9.

The Physicians Neck and Back Center also includes treatment flow summary, which has handwritten notes for each session. Given the volume of sessions petitioner attended prior to vaccination, the most relevant ones are summarized.  On September 15, 2014, petitioner reported

---

He has held teaching positions at Stanford University Department of Neurology and Pediatrics since 1980.  *Id.*  Dr. Steinman is board certified in psychiatry and neurology and was elected to the National Academy of Sciences in 2015.  *Id.* at 2.  Dr. Steinman has authored or co-authored numerous articles on neurology and immunology.  *Id.* at 5-50.  He has served on different advisory commissions and committees, including the Advisory Committee on Pertussis Immunization, Institute of Medicine.  *Id.* at 4.  Dr. Steinman was admitted as an expert in neurology and immunology. Tr. 143.

pain in her lower back from moving bricks and landscaping.  Pet'r Ex. 4 at 31.  The next notation, on September 18, 2014, states that "pt feeling worn down from cellulitis, is taking antibiotics, [lower-back] is feeling good."  *Id.* at 32.

### 2.  Vaccination and Post-Vaccination Medical Record Summary

On October 8, 2014, petitioner received her flu vaccine at the flu vaccine clinic at Children's Hospital in Minneapolis/St. Paul.  Pet'r. Ex. 3 at 1.  On October 9, 2014, the day after petitioner received the vaccine, she reported sleeping in different positions and that her neck pain was greater than her back pain.  *Id.* at 32.  On October 13, 2014, petitioner reported that her lower back pain was improving but her neck pain and stiffness continued.  *Id.* at 33

Ten days later, petitioner went to the emergency department of the Maple Grove Hospital on October 18, 2014 for "worsening pain in [the] neck."  Pet'r. Ex. 7 at 3.  Petitioner explained that approximately one month prior she developed right-sided facial swelling and cellulitis, but the antibiotic prescription helped her condition.  *Id.* However, "over the same timeframe" petitioner developed neck discomfort, which was slightly to the left and some intermittent radiating pain up the back of her head.  *Id.* Petitioner was evaluated by Dr. Roline, who opined that the cause of petitioner's neck pain was a muscle spasm and not likely associated with an infection.  *Id.* at 5.  Petitioner was given a prescription of Percocet and Robaxin.  *Id.*

Petitioner had a follow-up appointment with her primary care physician for her cellulitis on October 20, 2014.  Pet'r. Ex. 5 at 15.  Petitioner reported that her cellulitis had improved, but she was now experiencing left-sided neck pain.  *Id.*  Petitioner reported that the Robaxin improved her symptoms, but the Percocet made her nauseous.  *Id.*  At this appointment, petitioner endorsed "brief left-hand tingling," but her neck pain was constant with intermittent stabbing with different positions.  *Id.*  The physical examination showed "no evidence of right auricular cellulitis," but petitioner had "decreased range of motion due to pain with lateral flexion and rotation," along with "significant paraspinal muscle and upper trapezius tenderness." *Id.*  Petitioner had no weakness during her examination.  *Id.*  Nurse Rydlund diagnosed petitioner with neck muscle spasm, gave her a prescription for Prednisone, and ordered an X-ray.  *Id.* at 16.

Two days later, on October 22, 2014, petitioner returned to her PCP for "ongoing neck pain."  Pet'r. Ex. 5 at 12.  Petitioner reported that the prednisone initially relieved her symptoms, but then her neck pain became acute at night, making it difficult to sleep.  *Id.*  Petitioner stated that she took the prednisone again in the morning, which relieved the pain, but the Vicodin and Robaxin did not help at all.  *Id.*  Petitioner endorsed tingling in her upper arm and shoulder, which was radiating down her left arm.  *Id.*  Nurse Rydlund also wrote, "What has changed and is more worrisome is that she has also noticed she is unable to lift [her] left shoulder/arm >90 degrees.  She has significant weakness.  If she tries really hard, she can actually lift it, but with much effort and her arm shakes.  She does not actually have shoulder pain."  *Id.*  Petitioner was given an order for a cervical spine MRI and diagnosed with both neck pain and left arm weakness.  *Id.* at 13.  Nurse Rydlund included a clinical note which extended petitioner's prednisone taper, and wrote, "Differential diagnosis includes shoulder pathology such as frozen shoulder or rotator cuff injury. Her exam seems to indicate this could be muscular in nature,

4

however, she did not have any injury and I find it odd that it seemed to occur in conjunction with the neck pain." *Id.*

The next day, October 23, 2014, petitioner presented to orthopedist, Dr. Patrick Kraft, for a left shoulder evaluation. Pet'r. Ex. 8 at 8. Petitioner explained that her left shoulder pain and weakness began two weeks ago, and also reported that she had cellulitis, which was treated with antibiotics. *Id.* Petitioner stated that she had increasing pain along the left side of her neck and was given Prednisone, but has developed significant pain and weakness. *Id.* Petitioner also reported associated tingling. She could not lift her arm actively and when lifted passively, she cannot bring it down. *Id.* The physical examination revealed "some discomfort in the cervical spine, particularly with motion [to the right]," and her shoulder exam showed, "marked weakness with abduction, active range of motion and external rotation." *Id.* at 9. She had a positive horn blowers sign[7] and "struggled to get her arm to the level of the belt line." *Id.* Dr. Kraft assessed petitioner with a "shoulder injury" and "left shoulder rotator cuff dysfunction and weakness," and ordered an MRI of her left shoulder. *Id.* at 9-10.

The same day, on October 23, 2014, petitioner left shoulder MRI showed minimal supraspinatus tendinopathy without evidence of a rotator cuff tear and minimal acromioclavicular and glenohumeral degenerative changes. Pet'r. Ex. 8 at 20. Petitioner had a follow-up appointment on October 24, 2014 at Twin City Orthopedics, where she was seen by PA David Winecoff. *Id.* at 11. PA Wincoff noted that petitioner still has pain and weakness in her left shoulder, and she was having difficult raising her arm past 40 degrees of forward flexion and abduction secondary to weakness. *Id.* Petitioner was given a prescription of Gabapentin and Hydrocodone-Acetaminophen until she could be seen by Dr. Kraft the following week for an EMG/NCS. *Id.* at 12.

On Friday, October 24, 2014, petitioner went to the emergency department of Maple Grove Hospital for neck and shoulder pain. Pet'r. Ex. 7 at 26. Petitioner reported that she began having pain "since last Tuesday after receiving the influenza vaccine" and that she was unable to lift her arm voluntarily. *Id.* Petitioner was seen by Dr. David Brooks at 1:40 AM on October 25, 2014, where she related her left shoulder pain and issues to the flu shot. *Id.* at 27. Dr. Brooks noted that petitioner presented him with "a paper that explains this is what she thinks her diagnosis is." *Id.* at 28. Petitioner reported that the only time her symptoms improved was when she was on Prednisone at a higher dosage. *Id.* Dr. Brooks gave her an IV of methylprednisolone and Robaxin and gave her a prescription of oral steroids to take at a higher dosage for five days. *Id.* Petitioner was discharged with a diagnosis of neck and shoulder pain. *Id.*

Two days later, on Sunday, October 26, 2014, petitioner returned to the emergency department of Maple Grove Hospital with shoulder pain. Pet'r. Ex. 7 at 48. The emergency department's nurse's note states that petitioner's "right arm is worsening. Has constant bilateral elbow, back and scapula pain, not relieved by any medications above." *Id.* Additionally, the nurse's note stated that petitioner was feeling constipated despite taking Miralax twice a day. *Id.*

---

[7] A hornblower's sign is positive in a shoulder exam when a patient cannot externally rotate their arm while it is elevated 90 degrees in the scapular plane. It is a test for a tear or fatty degeneration in the teres minor and infraspinatus muscles in the shoulder.

The "History of Present Illness" taken by emergency room's physician, Dr. Christopher Borger on October 26,, stated:

> [Petitioner] is a 50-year-old female with a history of hypothyroidism who presents for evaluation of left shoulder pain.  The onset was 16 days ago.  The quality is described as onset of pain two days after flu vaccine placed unusually high in the left shoulder….She has been on escalating doses of steroids, Robaxin, Ibuprofen, Vicodin, Percocet, and Neurontin.  The pain continues to worsen….She did research on her own and brings a 2010 paper published in Vaccine (journal) by S. Atanasoff that describes a syndrome of pain following accidental vaccine injection into the joint space that she feels perfectly describes what she is facing.  She also had some weakness with abduction of the shoulder bilaterally and some tingling in her ulnar nerve area.

*Id.*  During the physical examination, also by Dr. Borger, petitioner demonstrated slight weakness with abduction of her left shoulder, normal symmetric grip strength and flexion of the biceps.  *Id.* at 50.  Petitioner's gait was normal, and she was able to get on her tip-toes and dorsiflex with the "great toes."  *Id.*  Dr. Borger assessed petitioner with "left shoulder pain after vaccination, possible due to inflammatory response to accidental joint injection," and agreed to admit her for observation and an orthopedic consultation.  *Id.* at 51.

After admission, petitioner was seen by Dr. Rodney McFadden, who wrote that petitioner's left arm pain and weakness began two days after the flu vaccine.  Pet'r. Ex. 7 at 54.  The HPI also explained that petitioner could not actively abduct her left arm past 45-degrees and that she had developed paresthesias in her fingertips and thumbs of her left arm.  *Id.*  Dr. McFadden noted that petitioner also was experiencing paresthesias in her right hand as well and some weakness of the right arm that started the night before.  *Id.*  Dr. McFadden performed a physical examination and found that petitioner's left arm demonstrated decreased range of active motion and decreased strength.  *Id.* at 58.  Petitioner's reflexes in her upper extremities were 0 to 1+ symmetrically and bilaterally.  *Id.*  Dr. McFadden assessed petitioner with "acute left arm pain with weakness and mild anesthesia in fingertips with acute right arm paresthesias and weakness," and noted the etiology was unclear.  *Id.*  Dr. McFadden stated that the cause of petitioner's left arm issue could be related to a possible SIRVA injury, or a possible neurologic syndrome related to the flu vaccine such as Guillain-Barre.  *Id.* at 60.  He requested a neurology consult and an EMG.  *Id.*  Dr. McFadden also discontinued petitioner's prednisone taper and instead prescribed the use of an intravenous steroid, dexamethasone.  *Id.*

The following day, October 27, 2014, petitioner explained that she was experiencing "numbness shooting in her arms," and some numbness in her abdomen.  Pet'r Ex. 7 at 63.  Dr. Knot Khandurao recorded that petitioner described an "area of altered sensation around the belly above the umbilicus."  *Id.*  Petitioner demonstrated left arm weakness and limited mobility, and had parathesias in both hands.  *Id.* at 64.  Dr. Khandurao opined if petitioner had polyneuritis and wrote, "It could be related to the vaccine or it may not be related to it…I agree with [having] and EMG.  Neurology consult requested….And MRI cervical spine if not already done."  *Id.* at 65.

Petitioner had a neurology consult by Dr. Irfan Altafullah on October 27, who took petitioner's History of Present Illness, which is recited below:

50-year-old nurse who received a flu shot in her left arm about 18-days ago.  A few days later, she developed pain around the left shoulder.  The pain also seemed to involve the left trapezius and paracervical region.  Gradually, the pain involved the left upper arm o the level of the elbow, but she did not have classic radicular type symptoms.  The pain was bad enough that she came to the ED a couple of times.  She was treated with various analgesics.  She had an MRI of the cervical spine on 10/22 that was reported to show some low grade disc bulges and DJD at C4-7.  She also had a shoulder MRI that showed mild supraspinatus tendinopathy.

About five days ago, (10/22) she began noticing weakness of the left upper extremity which progressed over the next couple of days.  She has noticed some paresthesia in the left hand, and since last night, also some in the right hand.  She has also noticed a band of paresthesia around her trunk.

Pet'r Ex. 7 at 72.  Petitioner had decreased strength in the left upper extremity, with a 2/5 in the supraspinatus and deltoid area and 3/5 in the biceps and supinator.  *Id.* at 73.  She had decreased sensation in her left upper extremity and diminished deep tendon reflexes in both arms.  *Id.*  Dr. Altafullah wrote that petitioner's "history and examination are most consistent with brachial plexitis or Parsonage Turner Syndrome," and that "Parsonage-Turner syndrome has been well described as a consequence of vaccination and is presumably an immune mediated response."  *Id.* at 74.  He recommended discontinuing the Decadron and begin a prednisone taper and start physical therapy.  *Id.*

The following day, October 28, 2014, petitioner reported having a lot of pain in her left arm and her weakness had not improved.  Pet'r. Ex. 7 at 80.  Dr. Khot wrote that petitioner had "a band of altered sensation in the abdomen above the umbilicus," along with her left arm weakness and bilateral parathesias in her hands.  *Id.* at 81.  Orthopedist, Dr. Brian O'Neill, saw petitioner on October 27, 2014, who found petitioner's upper extremity strength "intact distally" and "good supraspinatus testing bilaterally."  *Id.* at 86.  He wrote that a shoulder injection would not be helpful to petitioner because she had no pain with range of motion and indicated that petitioner's problem appeared to be more neurologic in nature than orthopedic.  *Id.*

Petitioner was discharged on October 29, 2014 with a discharge diagnosis of "polyneuritis-etiology unclear," and "brachial plexitis."  Pet'r, Ex. 7 at 87.  The discharge summary also indicated that petitioner had "new onset left arm pain and weakness associated with bilateral paresthesias in hands and fingers, now has a band of altered sensation in the abdomen above the umbilicus.  Symptoms started after influenza vaccine."  *Id.* at 89.  Additionally, the note explains that petitioner's "periumbilical band like symptoms won't be explained" by "idiopathic brachial plexitis," as suggested by the neurology consult.  *Id.*  However, she was still discharged with instructions to follow-up with physical therapy and neurology.  *Id.*

The following day, October 30, 2014, petitioner returned to the Maple Grove Hospital Emergency room, this time with leg weakness, along with the continued weakness in her left arm and occasional weakness in her right arm.  Pet'r, Ex. 7 at 239.  Petitioner called Dr. Altafullah

7

and was told to return to the emergency department due to her progressing weakness. *Id.* The neurological examination showed "weak biceps and triceps in the left arm and full range of motion and strength in the right arm," and she had retained deep tendon reflexes as the knees, however, petitioner endorsed bilateral paresthesias. *Id.* at 240. Dr. Altafullah ordered an MRI of petitioner's thoracic and lumbar spine to "look for any evidence of transverse myelitis." *Id.* at 241. The MRI of petitioner's lumbar spine showed degenerative disc changes at L4-5 and L5-S1 and asymmetric narrowing of the superior aspect of the lateral recess L5-S1 nerves, and the impression was "no evidence of transverse myelitis." *Id.* at 245. Petitioner's thoracic spinal MRI was normal. *Id.* at 246. A lumbar puncture demonstrated 104 white blood cells and an elevated protein of 149. *Id.* Given the elevated protein in petitioner's CSF, she was transferred to North Memorial Hospital, with orders to get an MRI of her cervical spine. *Id.* at 241. The differential discharge diagnoses included "possible transverse myelitis or unusual presentation of Guillain-Barre." *Id.*

The HPI of petitioner at North Memorial explained that the neurology department at Maple Grove believed that petitioner had "brachial plexitis-immune mediated response to vaccination," and stated, "of note had been treated for a cellulitis of the face prior to the flu shot and onset of neuro symptoms." Pet'r. Ex. 9 at 5. Petitioner's neurological exam upon admission at North Memorial was positive for weakness in her left upper extremity. *Id.* at 8. Petitioner's differential diagnoses included "transverse myelitis vs. meningitis vs. Lyme related neuritis." *Id.* at 9.

Petitioner was evaluated by neurologist, Dr. Jason Cornelius, and he suspected petitioner had "post-vaccination autoimmune/inflammatory polyradiculoneuropathy similar to GBS spectrum disorder," after petitioner's physical examination showed absent reflexes in the upper extremities and knees, and petitioner had weakness in her left upper extremity. Pet'r. Ex. 9 at 20-22. Dr. Cornelius ordered a three-day course of IVIG. *Id.* at 22. Additionally, petitioner was started on an intravenous course of antibiotics after her Lyme tests came back positive.

After one-day of IVIG, petitioner reported that her pain level had reduced, but her bilateral upper extremity weakness remained. Pet'r. Ex. 9 at 24. Additionally, she reported having spasms/paresthesias in a band around her abdomen. *Id.* Petitioner still had absent reflexes in her bilateral upper extremities and knees bilaterally. *Id.* at 24. Neurology Physician Assistant Teague wrote, "It seems likely now that her symptoms are related to Lyme infection, but there remains a possibility that the recent influenza immunization could have played a role." *Id.* at 25. Dr. Ivan Brodsky agreed with PA-C Teague's note and wrote, "Symptoms probably related to Lyme's disease but many confusing co-morbidities." *Id.* at 25-26.

While petitioner was hospitalized at North Memorial Hospital Dr. Cornelius ordered an NMO-Aquaporin-4 antibody test, which was returned the following day that showed petitioner had a "positive" NMO/AQP4 antibody that was "high." Pet'r. Ex. 9 at 99. However, during the hearing, petitioner testified that none of her treating physicians at the time actually told her or apparently acted on this finding. *See* Tr. 48.

Infectious disease doctor, Dr. Sarah Peglow, saw petitioner on November 1, 2014 and assessed petitioner with "polyradiculoneuropathy with sensory and motor component with

positive Lyme serology and lymphocytic pleocytosis of CSF concerning for Neuroborreliosis. Alternatively, she also fits multiple different spectrums of disorders, including post-vaccine autoimmune process similar to GBS and/or inflammatory brachial plexitis.  Given the degree of her symptoms and complex nature, would favor treatment for possible neuroborreliosis.”  Pet'r. Ex. 9 at 26.  Dr. Peglow agreed with continuing treatments for possible GBS spectrum syndrome, and also suggested “treatment for neuroborreliosis based on [petitioner's] clinical picture and her serology positivity.  Although these can be falsely elevated in the setting of other autoimmune syndromes going on, it is also plausible that these symptoms are related borrelia infection.”  *Id.* at 26.  Dr. Peglow also noted that “[t]he myriad of symptoms are also fitting with her recent influenza immunization resulting in possible autoimmune reaction however, her EMG is not fitting at this time per neurology….but possible underlying autoimmune disease which can lead to falsely positive Lyme serologies.”  *Id.* at 27.  Petitioner was started on intravenous Ceftriaxone (antibiotics).  *Id.* at 26.

By November 2, 2014, petitioner reported that her weakness and numbness has stayed the same if not getting worse, despite getting a second dose of IVIG.  Pet'r. Ex. 9 at 39.  Petitioner stated that she was experiencing neck and back pain, similar to the pain around her abdomen.  *Id.* The neurological exam was positive for decreased grip strength bilaterally, decreased coordination, and decreased sensation diffusely.  *Id.*  Petitioner was seen again by infectious disease physician, Dr. Peglow on November 2, 2014, and she assessed petitioner with, “Polycariculoneuropathy with sensory and motor components with positive Lyme serology and lymphocytic pleocytosis of CSF concerning for NEUROBORELLIOSIS.  Alternatively, she also fits multiple different spectrums of disorders, including post-vaccine autoimmune process similar to GBS and/or inflammatory brachial plexitis.  Given the degree of her symptoms and complex nature, would favor treatment for possible neuroborreliosis.”  *Id.* at 42.  Treatment of intravenous antibiotics was added to petitioner's treatment plan.

That same day petitioner had a consult with neurologist, Dr. Xiaoming Dong and she demonstrated absent reflexes in her upper extremities and knees, with trace ankle reflexes.  Pet'r. Ex. 9 at 44.  Dr. Dong explained:

> This is a very interesting case.  A 50-year-old woman who received influenza vaccination at left shoulder area on 10/8.  Shen then developed severe pain at injection site.  About two weeks later, she developed left [upper extremity] weakness.  Her symptoms had continued to progress with more left upper extremity and mild right upper extremity weakness.  She also developed sensory level and lost [deep tendon reflexes] on follow-up exam.  MRI of cord showed no evidence of transverse myelitis or nerve root inflammation.  CSF is very abnormal with elevated cell count and protein.  A post-vaccination autoimmune/inflammatory polyradiculoneuropathy was suspected.  She has been started with Prednisone and IVIG.  Current Prednisone 20 mg [as needed].  She seemed responding to treatment well.  Will finish IVIG for 5 days.  Her case is complicated with positive Lyme western blot.  Lyme disease can also cause polyradiculopathy.  [Infectious Disease] plan to start 28 day course of IV antibiotics.

*Id.* at 43-44.

The following day, November 3, 2014, petitioner was on her third day of IVIG. Pet'r. Ex 9 at 48. Neurologist, Dr. Cornelius, consulted with petitioner and noted that petitioner was experiencing "ongoing abdominal paresthesias, left upper extremity weakness greater than right," and she had altered sensation in her left upper extremity, greater than right, and absent reflexes. *Id.* Dr. Cornelius's assessment was "suspected peripheral nervous system manifestation of neuroborreliosis with possible contribution of post-vaccination autoimmune/inflammatory response to this polyradiculoneuropathy presentation." *Id.* at 48. Petitioner was to complete the five-day course of IVIG and the prednisone taper. *Id.*

Petitioner had a post-hospitalization appointment with neurologist Dr. Altafullah on November 10, 2014. Pet'r. Ex. 6 at 11. In the "History of Present Illness" Dr. Altafullah wrote that petitioner responded immediately to the five-day course of IVIG and that she was being treated with intravenous antibiotics for positive Lyme IgG and IgM. *Id.* Petitioner reported still having numbness and tingling in all of her fingers of her left hand and weakness in her left arm. *Id.* Additionally, petitioner reported that the band of tightness remained around her abdomen and she was having numbness in her pelvic area and belly. *Id.* Dr. Altafullah wrote, "This is a really puzzling case. It is possible that she does have neurological manifestations of Lyme disease and the vaccine was just a red herring. Alternatively, it is possible that the vaccination process somehow activated her Lyme disease. In any event, she does not seem to have had classical Guillain-Barre syndrome because of the very high [white] cell count in the CSF…I have asked her to return for follow-up in one month and will get an EMG and nerve conduction study at that time as well." *Id.* at 12. The diagnoses were, "Inflammatory neuropathy" and "lyme disease." *Id.*

Petitioner returned to Dr. Altafullah on December 10, 2014, reporting feeling better and her left-hand symptoms had improved. Pet'r. Ex. 6 at 19. Petitioner had finished her course of intravenous Rocephin for Lyme disease. *Id.* Petitioner still demonstrated weakness in the left deltoid and triceps, along with difficulty lifting her arm above her head, but the numbness in her rib cage had decreased. *Id.* Dr. Altafullah wrote that petitioner's left arm had much improved since when he had first seen her and that petitioner's deep tendon reflexes had returned. *Id.* at 20. He wrote, "[Petitioner] continues to improve. I am optimistic that she will be close to her baseline after she is done with the exercise program at Physicians Neck and Back Clinic. She might have poor endurance for awhile longer." *Id.* at 20.

On December 19, 2014, petitioner went to the Physicians Neck and Back Clinic for treatment. Pet'r. Ex. 4 at 39. The physical therapist wrote, "Symptoms: upper back pain, interscap pain, R upper arm pain," and that the "onset/incident: 9/28/2014-after flu shot, then lyme/GB." *Id.*

Petitioner had another follow-up appointment with Dr. Altafullah on January 13, 2015. Pet'r. Ex. 6 at 22. Petitioner reported difficulty lifting her left arm beyond shoulder height and her weakness in her left leg. *Id.* She also endorsed a burning sensation in the middle of her back and chest. *Id.* Petitioner stated that she was attending physical therapy sessions at Physicians Neck and Back Clinic and trying to go to the gym on her own. *Id.* The physical exam showed normal strength in her right upper limb and lower limbs, but her left upper limb still exhibited slight weakness in the deltoid and triceps areas. *Id.* at 23. She also had weakness in her left leg.

10

*Id.* Dr. Altafullah noted that petitioner was making "slow progress" and that her predominant deficit was endurance and "fatigue dependent left sided weakness." *Id.* at 24. Dr. Altafullah filled out petitioner's long-term disability forms as well.

The next month, on February 25, 2015, petitioner returned to Dr. Altafullah stating that she is in more pain than in January and her arms and legs hurt. Pet'r Ex. 6 at 27. Petitioner reported a burning pain in her lower neck and upper back that radiates down to her mid-to-low back. *Id.* She also still had difficulty lifting her arms above her shoulder, especially with the left arm, and she still had poor endurance. *Id.* Dr. Altafullah wrote that he was "somewhat disappointed at her lack of progress and continuing symptoms," and recommended that petitioner have a check-in with an infectious disease physician and have an MRI of her thoracic spine because of her "persistent midback paresthesia." *Id.* at 28.

Petitioner's thoracic spine MRI done on March 5, 2015 showed "interval development of central intramedullary T2 prolongation of the distal spinal cord from mid-T12 to lower L1 compatible with transverse myelitis or other inflammatory myelitis. No associated enhancement to suggest active inflammation." Pet'r. Ex. 6 at 31. On March 30, 2015, petitioner had another appointment with Dr. Altafullah, who acknowledged the MRI finding of a central, intra-medullary region of prolonged T2 signal from mid-T12 to lower L1, and wrote, "I am somewhat surprised to see the MRI abnormality in the lower thoracic spine." *Id.* at 33. He recommended she get a cervical spine MRI and he increased her gabapentin. *Id.* Petitioner's cervical MRI did not demonstrate any changes from October 2014. *Id.* at 39.

Petitioner returned to Dr. Altafullah on April 29, 2015, still experiencing pain between her shoulder blades that radiates "to 2 points just underneath the clavicle in front, especially with deep breathing" and "tingling in her left triceps and rarely in her right." Pet'r. Ex. 6 at 40. Petitioner reported seeing a physical therapist twice a week and exercising vigorously. *Id.* Dr. Altafullah wrote, "[Petitioner] is holding her own and I am pleased that her symptoms are slightly better. As she is already having some excessive daytime sleepiness, I don't think we can go further up on the gabapentin. I encouraged her to increase her level of physical activity and strengthening. She does not appear ready to return to work just yet." *Id.* at 41.

On June 8, 2015, petitioner had another Lyme West Blot IgG and IgM test, which was positive for Lyme IgM. Pet'r. Ex. 6 at 43. The next day, June 9, 2015, petitioner had an appointment with Dr. Altafullah, when she reported waking up with a swollen lymph node in the left submandibular region and numbness of the left side of her face, which was ongoing. *Id.* at 46. Petitioner also had numbness over the crown of her head, occasionally crossing to the right side of her face. *Id.* Petitioner acknowledged the elevated levels of IgM Lyme antibody and took a double Medrol dosepak, which initially helped, but not after the first day. *Id.* Petitioner's pinprick perception was normal over her face, arms, and legs, and her fine finger movements were normal. *Id.* Dr. Altafullah opined that he was "not sure what to make of her recent symptoms" and that he did not have a good neurological explanation. *Id.* He wrote, "I am still wondering whether the symptoms could be a manifestation of underlying Lyme disease and wonder consider doing another spinal fluid examination. However, first I would like to get a second infectious disease opinion." *Id.* at 46.

11

Petitioner had a follow-up MRI of her thoracic spine on July 8, 2015, which showed no new thoracic spinal cord lesion, abnormal cord enhancement, or cord caliber alteration.  Pet'r Ex. 6 at 48.  The lesion that was demonstrated on the previous MRI from her T12 to lower L1 was stable.  *Id.*

On August 11, 2015, petitioner had a second opinion at the Mayo Clinic with neurologist, Dr. Sean Pittock.  Pet'r. Ex. 10 at 1.  In the History of Present Illness, petitioner reported onset of pain in her left shoulder and neck two days after her October 8, 2014 flu vaccination, which developed into left arm weakness from October 10 to 22.  *Id.*  She described hand and thumb weakness and some sensory symptoms affecting both of her upper extremities, and a band-like sensation in her abdomen.  *Id.*  Without specifically identifying the date the MRI of her thoracic spine showing a longitudinally extensive area of signal abnormality, she indicated she was admitted to the hospital.  *Id.*  Petitioner endorsed improvement after her hospitalization with treatment of IVIG, methylprednisolone, and Ceftriaxone for Lyme.  *Id.*  She explained that in June 2015 she developed painful lymph node swelling and some numbness affecting her left face and then extending to her whole body and oral prednisone gave her some improvement.  *Id.*  Dr. Pittock performed a physical examination and found petitioner to have "an essentially normal neurological examination," but slight reduction in reflexes throughout and her plantar responses were equivocal.  *Id.* at 2.  Dr. Pittock also noted that petitioner was positive for aquaporin-4 antibodies, which raised the "possibility of neuromyelitis optica spectrum disorder."  *Id.* He wrote:

> …should the final diagnosis be neuromyelitis optica spectrum disorder, given the fact that she has had one attack in October 2014, and another attack in February 2015, and a third attack in June 2015, she would be a candidate for the Eculizumab study.

*Id.*  Dr. Pittock wanted the Mayo Clinic neuroradiologists to interpret petitioner's MRIs and comment on the evolution of abnormalities.  *Id.*  Petitioner's diagnoses were, "Longitudinally extensive transverse myelitis; Aquaporin-4 antibody positivity; History of Lyme Disease."  *Id.* at 3.

Petitioner also saw infectious disease physician on August 14, 2015, Dr. Varatharaj Palraj, at the Mayo Clinic.  Pet'r Ex. 10 at 7.  After reviewing her history, noting that petitioner was positive for Lyme IgG and IgM in October and was treated with intravenous ceftriaxone for four weeks, he stated, "She probably had Lyme disease in October 2014 based on serological workup, but she has had appropriate treatment with four weeks of intravenous ceftriaxone.  I would not recommend any further testing or treatment regarding that."  *Id.* at 9.

On August 13, 2015, neuroradiologist at the Mayo Clinic, Dr. C.H. Rydberg, reviewed petitioner's previous MRIs from October 30, 2014 and compared them to the MRIs from March 5, 2015, April 1, 2015 and July 8, 2015 and wrote:

> Impression: Longitudinal area of increased T2 signal in the distal thoracic cord and conus consistent with the clinical diagnosis of NMO.  Findings: Abnormally increased T2 signal centrally within the cord at the T12-L1 levels does not change appreciably over the series or examinations.

Pet'r. Ex. 10 at 112.

Petitioner had a follow-up appointment with Dr. Pittock on August 27, 2015.  Pet'r. Ex. 10 at 30.  Dr. Pittock noted that petitioner complained of new onset eye pain the previous week and neuro-ophthalmology found "no abnormality and did not feel there was any evidence of optic neuritis."  *Id.*  He also wrote that petitioner's neurological examination by Dr. Alfugham was "unchanged" despite petitioner complaining of some tingling in her upper extremities.  *Id.*  Dr. Pittock wrote, "Furthermore, looking back over her prior history and the lack of any signal abnormality in the upper cervical cord or in the brainstem, raises concern regarding whether or not there were definitive brainstem or cervical cord attacks that might explain her symptoms in the past, *but certainly no doubt on her neuroimaging of the thoracic cord that she has had a longitudinally extensive lesions and in the setting of NMO, I do think that the likely diagnosis is that of an NMO spectrum disorder." Id.* (emphasis added).  He recommended a Prednisone taper, along with CellCept.  *Id.*  Dr. Pittock's diagnosis remained neuromyelitis optica.  *Id.* at 31.

On February 16, 2016, petitioner had a follow-up appointment with Dr. Pittock, where she reported no new neurological symptoms and "no symptoms suggestive of an attack."  Pet'r. Ex. 30 at 35.  Petitioner reported occasional pins and needles in her upper extremities and some "burning affect in her neck," but no numbness or weakness in her lower extremities.  *Id.*  Dr. Pittock recommended a repeat MRI of her cervical spine and repeat of the Aquaporin-4 antibody test.  The following day, after petitioner's MRI, she met with Dr. Pittock again who explained that her MRI does not show any evidence of demyelination.  *Id.* at 36.  He also recommended petitioner begin to take prednisone every other day, and explained that there is "an increased risk of neuromyelitis optica spectrum disorder attack in the setting of stopping steroid, but steroid side effects over the long-term may cause significant problems."  *Id.* at 36.  He opined that petitioner may be having a "mild attack," and that "the neuroimaging abnormalities have not yet developed."  *Id.*

Petitioner messaged Dr. Pittock on February 24, 2016, stating that "the burning in my mid-thoracic spine to base of my skull persists," and she was experiencing tingling on the left side of her fact, along with some pain and tingling in her biceps and triceps intermittently.  Pet'r. Ex. 10 at 40.  A message was sent back to petitioner indicating that sensory symptoms typically wax and wane.  *Id.*  Petitioner messaged the Neurology Clinic again on March 3, 2016, stating that she had gone to a NMO Conference in Los Angelos, CA, and was using some OxyCodone to manage ongoing neuropathy in her arms and legs and along the trigeminal nerve.  *Id.* at 41.  It was recommended that petitioner come back for an evaluation and MRI of her spinal cord, along with scheduling an appointment at the Pain Clinic.  *Id.* at 42.

Petitioner had the follow-up appointment on March 10, 2016 with Dr. Pittock.  Pet'r. Ex. 10 at 44.  Dr. Pittock noted that petitioner's dosage of Cellcept was decreased to the "lower end of the therapeutic range" after the last appointment and now she was experiencing persistent burning discomfort between her shoulder blades and back of the neck, along with a burning-tingling down her arms.  *Id.*  Dr. Pittock recommended that petitioner increase her dosage of Neurontin to 600 mg three times and a day and increase her Cellcept dosage to 1500 mg in the morning and 1000 mg in the evening.  *Id.*  Dr. Pittock characterized the symptoms petitioner was

13

experiencing as "the possibility of an attack" but noted she had no changes in her neurological examination. *Id.* Her repeat MRI and lumbar punctures were normal and Dr. Pittock explained to petitioner, "The most important thing is to make sure that she does not experience an attack which has been reasonably ruled out by normal MRI and negative CSF for inflammation." *Id.* at 50.

Petitioner had an annual neurological evaluation with Dr. Pittock the following year, on March 21, 2017. Pet'r. Ex. 10 at 75. Petitioner was taking Cellcept daily, but did not experience any ongoing symptomology. *Id.* Concerned about ongoing neuromyelitis attacks, Dr. Pittock ordered a re-check of petitioner's Aquaporin-4 and MRI of her cervical spine. *Id.* Petitioner's Aquaporin-4 testing was negative. *Id.* at 76.

On July 31, 2017, petitioner had an appointment with Dr. Fredericks for managing lower back and right hip pain. Pet'r. Ex. 10 at 99. She reported re-starting physical therapy and that her back pain was well controlled. *Id.* Petitioner's strength in her bilateral upper and lower extremities were normal. *Id.* at 102. Dr. Fredericks noted that petitioner was taking a low dose of hydromorphone for acute flares of her neuromyelitis optica and for neuropathic pain and that petitioner was seeking another prescription. *Id.*

On September 24, 2018, petitioner had an appointment with neurologist, Dr. Andrew Smith, at the Fairview Neurology Clinic in Maple Grove. Pet'r. Ex. 41 at 101. Dr. Smith noted that petitioner had "first developed symptoms in fall of 2014 after a flu vaccine," and that she was initially treated for GBS, but after developing weakness and numbness again, an MRI revealed a lesion in her thoracic cord. *Id.* Petitioner was diagnosed with NMO after a positive antibody finding at the Mayo clinic, but has no new lesions. *Id.* Petitioner reported "rare tingling in her hands and feet," which occur mostly if she works multiple 12-hour shifts in a row. *Id.* at 102. After a physical examination and a review of her previous imaging, Dr. Smith diagnosed petitioner with NMOSD and wrote:

> The patient is a 54-year-old woman with a past medical history of NMOSD, who is presenting today as a new consult. The patient has a history of transverse myelitis with evidence on MRI…The patient does have one reported positive NMO antibody. Given how well she has done and the negative testing one could question the diagnosis. Moreover, her symptoms would not clearly be explained by the lesions in her spine. With this said, given her CSF, I feel it more probably than not NMOSD.

*Id.* at 106. Dr. Smith continued petitioner on CellCept. *Id.*

She continued to see Dr. Smith for management of her NMOSD. The last appointment relating to her NMOSD in the medical records occurred on February 11, 2021, with Dr. William Schmalstieg, where she reported no new changes in her vision, strength or sensation suggestive of relapse. Pet'r Ex. 48 at 66. Dr. Schmalstieg wrote that petitioner's NMOSD was "stable with no evidence of active inflammatory or demyelination," and he recommend that she return in six months. *Id.*

14

### b. Petitioner's Testimony

Petitioner testified that prior to receiving the flu vaccine on October 8, 2014, she had developed cellulitis of her right ear in September 2014. Transcript ("Tr.") 10.  Her right ear was "swollen, hot, [and] painful," and she received antibiotics for treatment.  *Id.*  She took a 10-day course of antibiotics.  When asked when the swelling of her right ear began, she stated, "mid-September" and that the cellulitis had resolved when she received the flu shot in October.  *Id.*  She explained that her cellulitis caused some pain on the right side of her face, but once she began the antibiotics, all of her pain related to the cellulitis went away.  Tr. 65.

Petitioner testified that she typically gets the nasal flu vaccine, but in 2014 opted for the intramuscular flu shot.  Tr. 11.  The day after she received the flu vaccination, on October 9, 2014, petitioner experienced pain in her shoulder that radiated up from the injection site.  *Id.*  Petitioner stated that these symptoms never went away, they only got worse.  *Id.* at 12.  She took Tylenol and ibuprofen for the pain, but the pain was persistent over the weekend.  *Id.* at 13.  She stated that the pain also restricted her movement of her neck and shoulder.  *Id.*  When she got off her shift on October 17, 2014, she made an appointment for her physician for the following Monday.  *Id.*  However, the pain in her shoulder was so severe that she went to the Maple Grove emergency department on October 18, 2014.  *Id.; see also* Pet'r Ex. 7 at 3.  The pain medication petitioner was given in the emergency department hadn't worked and she kept her appointment with her primary care physician on October 20, 2014.  Tr. 17.

When petitioner saw her primary care physician on Monday, October 20, 2014, she was put on steroids.  Tr. 17.  She testified that on Wednesday, October 22, 2014, she was unable to lift her arm above mid-chest level and the pain was "intense."  *Id.* at 18.  At that point, petitioner was unable to move her left arm herself and she also had numbness and tingling in her fingers of her left hand.  *Id.* at 19.  This was the first day she noticed numbness and weakness in her left arm.  *Id.*  Petitioner testified that PA Rylund suggested that she see an orthopedist, but petitioner "felt like it more neurologic with the numbness and tingling and the loss of function," but that it was going to be easier to get an orthopedic appointment and a neurologic appointment could take another month to schedule.  *Id.* at 20.  Petitioner testified that prior to October 22, 2014, she had "this constant pain" that was followed by loss of function in her left arm.  Tr. 24.

When she went to the orthopedist on October 23, 2014, petitioner stated that Dr. XXX told her that there was nothing structural in her shoulder causing her left arm weakness, but recommended an MRI to rule out any possible rotator cuff problems.  Tr. 20.  By Friday, October 24, 2014, the pain in her left arm was "intense" and the numbness feeling had increased, petitioner went to the walk-in orthopedic clinic and reported that her condition "felt much more neurologic."  Tr. 25.  Petitioner testified that the MRI of her shoulder appeared to be normal for her age and she was prescribed Gabapentin.  Tr. 26.  While she was waiting for the pharmacy to fill her prescription, she stated that the "pain was unbearable."  *Id.*  She took the first dose of Gabapentin and waited, but it provided no relief, so she decided to have a friend drive her to the emergency room.  *Id.*  Petitioner went to the emergency department and was given steroids and additional pain medication, but would not have been able to have a neurologist consult until Monday, so she opted to be discharged.  *Id.* at 27.

However, by Sunday night, October 26, 2014, her pain remained "unbearable despite all the medications [she] was taking," and asked her husband to drive her back to the emergency room. Tr. 27. Petitioner testified that she had "no relief from the pain, it was constant," and, "The numbness, tingling sensation in my left arm was constant," and her arm weakness had increased. Tr. 28. During her admission on Sunday evening, October 26, 2014, while admitted, she noticed paresthesia and numbness, "like a belt around my middle, from just below my breast to my bellow button." *Id.* She saw the neurologist, Dr. Altafullah on Monday, October 27, 2014, and she reported the paresthesia around her middle, but he appeared to be focused on a possible brachial plexus injury. *Id.* at 29. Petitioner testified that she had received IV prednisone and IV pain medication, but that had stopped prior to her being seen by Dr. Altafullah. *Id.* She stated that once she was put back on steroids, as well as the stronger pain medication, she finally got some relief, but even when she was discharged on October 29, 2014, her pain was "as high as 10," but would drop to a 4 or 5 with the medication. *Id.* at 31.

Petitioner testified that after she was discharged, she still had left arm weakness and then she stumbled down a few steps "feeling like my legs were weak." Tr. 32. Petitioner called Dr. Altafullah's office and left a message, and also called her primary care physician's office to try to get an appointment because she was concerned about this new leg weakness. *Id.* Dr. Altafullah called petitioner and told her to straight to the emergency room of Maple Grove Hospital. Tr. 33.

Petitioner went to Maple Grove emergency room and had a lumbar puncture, then transferred to North Memorial Hospital and admitted to the neurologic ward. *Id.* Petitioner saw Dr. Altafullah's partner, Dr. Cornelius, who diagnosed petitioner with GBS related to the flu shot and she was treated with IVIG. *Id.* Petitioner testified that her treating physicians explained the diagnosis of GBS was "not typical" and how her symptoms were "atypical," but "that was the closest thing they could think of, and that was why they decided to try IVIG." *Id.* Petitioner testified that the IVIG did help her left shoulder movement and that by December 2014, her left shoulder movement was improving, and her pain was decreasing. Tr. 39-41. However, the paresthesia around her abdomen area was worse. Tr. 36-37.

Petitioner stated that through November and December 2014, she felt that she had been improving, but in January 2015, she was unable to run or even maintain a reasonable walking speed on the treadmill. Tr. 42. Petitioner was asked if her leg weakness had resolved, and she stated that "I still had that [parathesia] belt" and that she would tell Dr. Altafullah. Tr. 42. She went to see Dr. Altafullah late February 2015, when he ordered an MRI of her thoracic spine. Tr. 42. She stated that he called her and told her the MRI revealed transverse myelitis and to come back into the clinic. She testified that "it was literally three or four weeks after I had that MRI before I was told that the MRI was abnormal." Tr. 43.

Petitioner testified that she was not hospitalized in 2015, but did see an infectious disease specialist. Tr. 45. Petitioner stated that the infectious disease physician "did not think that my symptoms were consistent with long-term post-Lyme syndrome." Tr. 45. Petitioner testified that in July 2015, she received a letter from Dr. Pittock from the Mayo Clinic, inviting her to be in a research study for patients with neuro-inflammatory disease. *Id.* at 46.

16

Petitioner testified that she learned of her positive aquaporin-4 test in July 2015 and that Dr. Altafullah went back to review her hospital records from October 2014 which indicated that there was a test for the NMO antibody, which was positive. Tr. 48; *see also* Pet'r Ex. 9 at 99 (finding a positive NMO/AQP4 antibody on October 31, 2014). Petitioner testified that after her evaluations at the Mayo Clinic, she was treated with Cellcept, which she continued to take through the hearing and afterwards as evidenced in the medical records.

At the hearing, petitioner testified that she has not had many symptoms related to her NMO and was able to wean off of gabapentin. Tr. 50. She explained she continued to take Cellcept due to the possible recurrence of NMO. *Id.* at 51. Petitioner testified that her shoulder pain ended in January or February 2015, but her neurological symptoms of burning, numbness and tingling resolved in 2018. *Id.*

### c. Petitioner's Expert's Opinions

### 1. Dr. Justin Willer, Neurologist

Petitioner submitted three expert reports from Dr. Justin Willer, a neurologist, and he testified at the entitlement hearing. *See* Pet'r. Exs. 12, 21, & 32. Dr. Willer opined that petitioner developed neuromyelitis optica spectrum disorder (NMOSD) as a result of receiving the flu vaccine on October 8, 2014 and that the onset of her NMOSD approximately 2 to 3 days post-vaccination. Pet'r. Ex. 12 at 10; Tr. 84. He stated that that "the reported onset of NMOSD following viral infection or vaccination generally ranges from 3 days to months." *Id.* During the hearing, he clarified that his position was that petitioner's NMOSD could not have started any later than October 20th or 22nd, but he could not say that her condition "had not started earlier." Tr. 128.

Dr. Willer explained that NMOSD is a an "autoimmune disorder of the central nervous system that classically patients present with recurrent attacks of optic neuritis and transverse myelitis." *Id.* at 87. Dr. Willer described the symptoms associated with NMOSD, which can include visual loss, or painful eye movement, paraparesis, dysesthesias, numbness, tingling, burning, potentially bladder and bowel involvement depending on which level is affected. Tr. 88-89. He explained that transverse myelitis will accompany the eye pain. Pet'r. Ex. 12 at 3. Additionally, aquaporin-4 antibodies are associated with NMOSD, which petitioner was found positive for on October 31, 2014. *Id.* at 4. He stated that petitioner's diagnosis was "pretty clear" based on her positive aquaporin-4 antibody test and appearance of lesions on the MRI involving the central area [of her spine]. Tr. 85. He explained that petitioner's symptoms of NMOSD could not have started any later than October 22, 2014, when she developed weakness and a band-like sensation. *Id.*

Dr. Willer disagreed with Dr. Sriram's opinion that petitioner's NMOSD began prior to vaccination. Pet'r. Ex. 12; Pet'r. Ex. 32 at 2. In his reports, Dr. Willer observed that petitioner's medical records include inconsistent dates of onset, but most of the records put onset *after* vaccination and the two records from Physicians Neck and Back from December 2014 simply record the wrong date of vaccination and that petitioner's treatment records from the same office do not include any neck or left shoulder treatment prior to the date of vaccination. Pet'r. Ex. 21

at 1-2.  Addressing respondent's expert's opinion that petitioner's NMOSD began prior to the vaccination, Dr. Willer observed that the medical records referred to by Dr. Sriram were not necessarily clear or consistent with petitioner's medical history.  For example, he noted that the December 19, 2014 record indicates that petitioner's flu shot was on 9/28/2014, which of course, is the wrong date.  Pet'r. Ex. 4 at 39; *see also* Pet'r. Ex. 32 at 2.  Dr. Willer also argued that the chiropractor records Dr. Sriram references as evidence that her NMOSD symptoms began either too close to the vaccination or even prior to the vaccination, only mention treatment to petitioner's lower back.  The records from July 31, 2014 and August 21, 2014 only reference petitioner being treated for lower-back pain.  *See* Pet'r. Ex. 4 at 1-10.  Similarly, the October 9, 2014 record, which was one day after the vaccination, petitioner's treatment was focused on her lumbar spine and she was assessed with "mechanical low back pain."  Pet'r. Ex. 4 at 11.  Further, Dr. Willer argued that Dr. Sriram ignores the history in the medical records which demonstrate that petitioner reported left shoulder pain post-vaccination.  Pet'r. Ex. 21 at 2.

In his three expert reports, Dr. Willer appeared to relate petitioner's reports of neck pain and left shoulder pain to the onset of her NMOSD.  *See* Pet'r. Ex. 21 at 3; Pet'r. Ex. 32 at 1-2.  In his third report, he identified multiple records where petitioner reported onset of pain since receiving the flu vaccine.  Pet'r. Ex. 32 at 2.  For example, he wrote, "Dr. Rodney McFadden on October 26, 2014, reported that she had gotten a flu vaccine 18 days earlier and "then approximately 16 days ago she developed left shoulder pain" which would be an onset of 2 days after vaccination.  Pet'r. Ex. 32 at 1.  He also wrote, "On October 25, 2014, [petitioner] made a report to employee health services that on October 10, 2014 she developed "some left sided neck and shoulder pain."  This would also indicate a 2-day onset from the time of vaccination to the development of symptoms."  *Id.* at 2.  Dr. Willer wrote, "As I wrote in my original report, the earliest onset date from vaccination to onset of symptoms for neuromyelitis is 3 days. Therefore, even if the true onset were 2 days, this would not be outside the realm of possibility to be casually related to the vaccination.  However, as outlined above, it is my opinion that the actual time from vaccination to onset was more likely than not about 3 to 4 days rather than 2 days."  *Id.*

During the hearing, however, Dr. Willer opined that petitioner's initial neck and left shoulder pain could have been caused by an improper injection into petitioner's shoulder or a possible brachial neuritis, rather than initial symptoms of NMOSD. Tr. 93.  He testified that petitioner's description of left shoulder pain was inconsistent with neuropathic pain, which would be seen with NMOSD and not affected by sleeping or movement.  *Id.* at 97.  Instead, Dr. Willer argued that the onset of petitioner's NMOSD was not two days post-vaccination, but instead more likely closer to October 20, 2014, when petitioner began to describe feelings of tingling.  Tr. 110; *see also* Pet'r. Ex. 5 at 15.  He noted that by October 22, 2014, petitioner was taking prednisone which appeared to reduce her pain, but now petitioner was experiencing left arm weakness, and her tingling had not yet subsided.  Tr. 111; *see also* Pet'r. Ex. 5 at 12.

However, Dr. Willer was unable to opine to a degree of medical certainty whether petitioner's symptoms of neck and left shoulder pain were related to the brachial neuritis diagnosis or a transient injection-site injury. Tr. 85-86.  He testified that the diagnosis of brachial neuritis could not be verified because petitioner's two EMGs did not examine any of her shoulder girdle muscles and her shoulder was not examined for a brachial plexus injury.  Tr. 86.

18

He testified that there were "no reports of scapular winging," and that her teres minor and supraspinatus and infraspinatus were never examined. *Id.* Dr. Willer testified that there would be a "number of explanations" for petitioner experiencing shoulder pain a day after the vaccination, including initial pain from the injection, but that a one-day onset for brachial neuritis "is a little quick…although not impossible." Tr. 114.

In order to form his opinion that petitioner's symptoms of NMOSD could not have started after October 20th or October 22nd, Dr. Willer relied upon petitioner's records from her primary care physician and the October 27, 2014 neurology consult. Pet'r. Ex. 32 at 2; Tr. 104, 111. Dr. Willer testified that the notation of intermittent tingling in petitioner's left hand on October 20th, could have been the beginning of neurological symptoms and potentially represented the e onset of her neurological condition. Tr. 104. He then testified that the October 22nd appointment, when petitioner returned to PA Rylund with significant left arm weakness was likely related to the transverse myelitis. Tr. 105. Later, he clarified that the weakness and paresthesia of petitioner's left hand was "coming from her spinal cord," and not the brachial plexus. Tr. 111. He testified that the earlier note of left-hand paresthesia could have been "very early onset of [the NMOSD]," but it's not 100%, but the band-like sensation "pretty much basically rules out this being anything related to brachial neuritis." Tr. 111-12. He explained that even though the medical record from October 22nd with PA Rylund did not mention a band-like sensation around petitioner's abdomen, the record from Dr. Altafullah dated October 27, 2014, indicates it had started by then. Tr. 105; *see also* Pet'r. Ex. 6 at 1. The October 27, 2014 neurology consult with Dr. Altafullah states:

> **HPI:** 50-year-old nurse who received a flu shot in her left arm about 18 days ago. A few days later, she developed pain around the left shoulder. The pain also seemed to involve the left trapezius and paracervical level. Gradually, the pain involved in the left upper arm to the level of the elbow, but she did not have classic radicular type symptoms…
>
> About five days ago, she began noticing weakness of the left upper extremity which progressed over the next couple of days. She has noticed some paresthesia in the left hand, and since last night, also some in the right hand. She has also noticed a band of paresthesia around her trunk.

Pet'r. Ex. 7 at 71-42; *see also* Pet'r. Ex. 32 at 2. During the hearing, Dr. Willer testified that in the second paragraph of this "History of Present Illness" provides detail regarding the onset of symptoms that are associated with NMOSD, such as weakness and paresthesia in her left hand, along with the band of paresthesia around her trunk suggesting spinal cord involvement, and not brachial neuritis. Tr. 111. He testified that this notation which describes petitioner's symptoms that are related to NMOSD puts onset at no later than October 22, 2014. Tr. 110 ("…it tells us that it couldn't have started any later than when she first noticed the band around her trunk.").

Dr. Willer discussed the Cho et al. article, which was a case report about a patient developing NMOSD following the flu vaccine. Tr. 121; Pet'r. Ex. 24.[8] Cho describes a patient

---

[8] Cho, J. et al., *A Case of Neuromyelitis Optica Spectrum Disorder Following Seasonal Influenza Vaccination,* 30 Mult. Scel. & Related Disorders, 110-13. [Pet'r Ex. 24].

who developed left hand paresthesia three days after receiving the flu vaccine, and then went on to develop a longitudinal lesion form her cervicomedullary junction to the level of T10.  Pet'r. Ex. 24 at 1.  Cho explains that NMOSD is an autoimmune disorder and while the "mechanism of NMOSD associated with infection has not yet been elucidated," it has been suggested that "infectious pathogens may potentially trigger autoimmune reaction of NMOSD, either by molecular mimicry or by inducing inflammatory molecules through nonspecific inflammatory stimuli." *Id.* at 3.  Dr. Willer stated that this case report demonstrates that the onset of NMOSD can occur three days after administration of the flu shot.  Tr. 122.  Dr. Willer also referred to the Menge et al. article which described four cases of neuromyelitis optica following the HPV to support a temporal association between vaccines and NMOSD.  Pet'r. Ex. 12 at 10; Pet'r. Ex. 17.[9]  The Menge article describes 4 VAERS reports in which neuromyelitis optic was reported following the administration of the HPV vaccine, although the onset of symptoms was 4-5 months post-vaccination.  Pet'r. Ex. 17 at 2.  Menge also explains that their VAERS search also found two cases of NMO after the hepatitis B vaccine and then 1 case each after the influenza and DPT vaccinations.  *Id.*

While discussing the findings of the Cho case report, Dr. Willer acknowledge that case reports do not provide definitive proof of causation, but he also stated that epidemiological studies would also not be able to address the relationships between vaccinations and autoimmune injuries.  Tr. 123.

Dr. Willer opined that the flu vaccine petitioner received on October 8, 2014 was the cause of her developing NMOSD, and it was unrelated to the later finding of her positive Lyme serology. Pet'r Ex. 21at 3.  He acknowledged that petitioner was treating for cellulitis in September, but did not believe that cellulitis can cause NMOSD.  Tr. 125.

Ultimately, he concluded that petitioner developed NMOSD, which was caused by the flu vaccine and her symptoms began approximately between 3-4 days post-vaccination and no later than 12 days.

### 2.  Dr. Lawrence Steinman

Petitioner submitted two expert reports by Dr. Steinman in support of vaccine causation and he testified at the entitlement hearing.  Dr. Steinman agreed that the correct diagnosis of petitioner was NMOSD, as confirmed by her aquaporin-4 antibodies.  Pet'r. Ex. 33 at 8; Tr. 152.

He opined that the flu vaccine petitioner received caused her to develop NMOSD through the mechanism of molecular mimicry. Pet'r Ex 33 at 10; Tr. 146-47.  Dr. Steinman explained that molecular mimicry occurs when a virus or bacteria share similar peptides with a host and then the immune response to the microbes can also result in an autoimmune disease.  Pet'r. Ex. 33 at 11.  Dr. Steinman stated that the theory of molecular mimicry is well accepted and that the Fujinami et al. article describes how molecular mimicry can result in autoimmune conditions.

---

[9] Menge, T. et al., *Clinical/Scientific Notes: Neuromyelitis Optica Following Human Papillomavirus Vaccination,* 79 Neurol. 285-287. [Pet'r. Ex. 17; Resp't Ex. C, Tab 2].

*Id.* at 11; Pet'r Ex. 35(j).[10]  Fujinami states that "molecular mimicry represents a shared immunologic epitope with a microbe and the host….viruses have been shown to have cross-reactive epitopes with host-self proteins." *Id.* at 1-2.  Additionally, Fujinami explained that the hepatitis B virus shared an immunologic epitope with myelin basic protein and when the viral hepatitis B viral was injected into rabbits, some of the animals developed experimental autoimmune encephalitis." *Id.* at 2.  Dr. Steinman also referenced the Gautam et al. article to show how autoimmune diseases can occur through molecular mimicry even when the shared peptides is limited.  Pet'r. Ex. 33 at 13; Pet'r. Ex. 35(n).[11]  In his expert report, Dr. Steinman, stated that Gautam and his colleagues, were able to induce experimental encephalomyelitis in mice when exposing them to herpesvirus with limited homology of just five amino acids to myelin basic protein.  Pet'r. Ex. 33 at 2.

He stated that NMOSD is known to be triggered by an immune response, an antibody response and there is also a T-cell response to aquaporin-4.  Tr. 155.  Dr. Steinman testified that "we know that petitioner had an immune response to aquaporin-4 and that the onset was sometime after she received the October 8th flu vaccine."  *Id.*

Specific to how the flu vaccine could cause NMOSD, Dr. Steinman stated that the 2014-2015 flu vaccine shares sequence homologies with aquaporin-4.  Pet'r Ex. 33 at 16; Tr. 147.  Using a BLAST search, he identified six out of 9 identical amino acids between the aquaporin-4 antigen and the influenza B component of the influenza vaccine.  *Id.* at 19; Tr. 158-59.  Dr. Steinman went beyond the BLAST search, and he refined his opinion by reference to the Immune Epitope Database ("IEDB"), to identify other references to the peptide that he identified as occurring in both the flu vaccine petitioner received and aquaporin-4.  Pet'r. Ex. 33 at 23; Tr. 171-73.  Then through a search of the IEDB, Dr. Steinman found that others had written about this peptide.  Pet'r. Ex. 33 at 24-26.  He explained that the sequence he found, which has six out of 9 identical amino acids, which is "capable of causing clinically relevant neuroinflammation." *Id.* at 24; Tr.

Responding to Dr. Forsthuber's criticism that his e-value on the BLAST search was too high, Dr. Steinman testified that the BLAST search was only the starting place for his theory, and he set the results as low as possible to get a string of consecutive amino acids.  Tr. 439-40.  Then after identifying six out of nine amino acids that were similar, he searched the IEDB and found that the nine amino acid sequence he was searching had four "hits" to influenza B.  Pet'r. Ex. 33 at 25; Tr. 171-73.  He found that for the T-cell assay, there was attribution to cytotoxicity in three out of three human samples.  Pet'r. Ex. 33 at 25; Tr. 435.  Dr. Steinman explained that this finding shows that the influenza B peptide drives a cytotoxic T-cell response that can kill the target virus, but since it also shares sequence homology with aquaporin-4, it may also drive a T-cell response to the aquaporin-4 water channel, resulting in NMO.  Tr. 435-36.

---

[10] Fujinami, R. et al., *Molecular Mimicry, Bystander Activation, or Viral Persistence: Infections and Autoimmune Disease,* 19 Clin. Micro. Bio. Revs. 80-96 (2006).  [Pet'r Ex. 35(J)].

[11] Gautam, A. et al., *A Viral Peptide with Limited Homology to a Self Peptide Can Induce Clinical Signs of Experimental Autoimmune Encephalomyelitis,* 161 J. Immunol. 60-64 (2020).  [Pet'r Ex. 35(n)].

During the hearing, Dr. Steinman testified that the Matsuya article, which respondent's expert referred to in his report, demonstrated that three out of 12 people with neuromyelitis optica respond to the aquaporin-4 antigen that is shared with influenza. Tr. 174. Dr. Steinman, refuting Dr. Forsthuber's expert reports, testified that it is "a misclassification to say that no one responds to that area of mimicry between the influenza B in [petitioner's] vaccine and the aquaporin-4," when 3 out of 12 responded. Tr. 175. He testified that Matsuya identifies "three humans with NMO" that responded to the influenza B amino acid sequence, and that it was likely this finding was not "statistically significant" because of the 9 MS patients who did not have a response the sequence. Tr. 434. Dr. Steinman testified, "I don't really care about the nine who didn't respond…but it is really poignant because three people with NMO did respond." Tr. 434.

With respect to the onset of petitioner's NMOSD, Dr. Steinman opined that antibodies to aquaporin-4 can develop within four days, especially in a person that had previously been exposed to the same antigen through a recall response. Pet'r. Ex. 33 at 28. He observed that petitioner had previously been vaccinated with the flu vaccine in 2012 and 2013 and that those vaccines shared identical or nearly identical influenza B viruses as the one she received in 2014. *Id.* While Dr. Steinman opined in his reports that the onset of petitioners NMOSD could occur between 2- and 4-day post-vaccination, during the hearing he testified that he agreed with Dr. Willer's assessment that petitioner was likely experiencing injection site pain two days post-vaccination and that her neurological symptoms likely started later. Tr. 196-97. Dr. Steinman testified that onset of 12-20 days would be "the sweet spot for [an immune] response." Tr. 197. He referenced the Shoenberger article, which examined cases of Guillain-Barre Syndrome ("GBS") after the 1976-77 flu vaccine, to demonstrate that the onset of a neurological disease can occur between 2- and 42-days post vaccination. Pet'r. Ex. 28.[12] Dr. Steinman testified that an onset of NMOSD symptoms between 3 and 18 days would be an appropriate timeframe for an immune response to the vaccine to develop and cause damage through the mechanism of molecular mimicry. Tr. 205.

During the hearing, Dr. Steinman testified that it was his opinion that petitioner did not have any NMOSD symptoms prior to the October 8, 2014 flu vaccine and that there was nothing else in the records that could have caused her to develop NMOSD. Tr. 205.

### d.  Respondent's Expert Opinions

#### 1.  Dr. Subramaniam Sriram

Respondent submitted three expert reports from Dr. Sriram and he also testified at the entitlement hearing. *See* Resp't. Ex. A, E, & F. Dr. Sriram did not dispute the diagnosis of NMOSD, instead he argued that her condition began prior to the vaccination and that the flu vaccine was not the cause of petitioner's condition. Resp't Ex. A at 5; Tr. 225.

#### A)  Opinion relating to onset of petitioner's NMOSD

---

[12] Schonberger, L. et al., *Guillain-Barre Syndrome Following Vaccination in the National Influenza Immunization Program, United States 1976-1977,* 110 Am. J. of Epidem. (1979). [Pet'r Ex. 28].

Dr. Sriram argued that the flu vaccine could not have caused petitioner's NMOSD, in part, because her symptoms began prior to the vaccination, and if not prior, immediately following the vaccination.  Resp't. Ex. A at 3; Resp't Ex. E at 4; Tr. 226, 247, 269.

Dr. Sriram asserted that petitioner's initial complaints of neck and left shoulder pain following the flu vaccine were the first symptoms of her NMOSD and that her medical records demonstrate that those symptoms began on or around September 28, 2014.  Resp't. Ex. F at 2; citing Pet'r. Ex. 4 at 14 (referring to petitioner's chiropractor's records from December 4, 2014). Dr. Sriram argued that the two medical records from Physicians Neck & Back Center dated on December 4, 2014 and on December 19, 2014 demonstrate that petitioner's neck and shoulder pain began prior to the vaccination.  Resp't. Ex. E at 2; Tr. 257-59 (testifying that he relied on the December 4, 2014 record to opine that petitioner's NMOSD began prior to the vaccination). However, during the hearing, he conceded that the note from petitioner's appointment on October 6, 2014, did not mention neck or shoulder pain.  Tr. 262.  Dr. Sriram also conceded that petitioner's medical treatment records from Physicians Neck & Back Pain do not document any neck or shoulder pain prior to October 9, 2014. Tr. 259. When he was asked to review the October 9, 2014 appointment note by the physical therapist, Dr. Sriram acknowledged that the therapist "related [petitioner's] neck pain…secondary to sleeping in different positions."  Tr. 259; *see also* Pet'r. Ex. 4 at 32 (S: c/o neck pain > [lower back pain]; sleeping in different positions; s/p cellulitis).

Dr. Sriram stated that her initial pain "has all the features of neuropathic pain…The pain had a stabbing nature, was intermittent in frequency and associated with tingling sensation in the hand."  Resp't. Ex. F at 2.  Further, he explained that petitioner's pain was only "modestly responsive to muscle relaxants and narcotic medication," and she got relief with steroids, which is the appropriate treatment for NMOSD.  Resp't. Ex. F at 2-3; Tr. 226-27.  In his third report, Dr. Sriram referred to an article by  Zhao et al. , which described the characteristics and frequency of neuropathic pain in patients with neuromyelitis optica, to support his opinion that the petitioner's neck and left arm pain corresponded to her NMOSD diagnosis.  Resp't. Ex. F at 1-2; Resp't. Ex. F, Tab 1.[13]  Zhao states that "neuropathic pain is a prevalent symptom in NMO-related myelitis, with the majority of patients complaining of constant pain."  Resp't. Ex. F, Tab 1 at 2.

Dr. Sriram was also asked to review the petitioner's medical record from Dr. Altafullah's consultation on October 27, 2014 during the hearing and testified that he "agreed with the timeline" of petitioner's clinical symptoms as provided in the "History of Present Illness."  Tr. 267; *see also* Pet'r. Ex. 6 at 1.  He acknowledged that the record stated that petitioner's left arm weakness began "about five days ago," and that weakness is a symptom of a neurological spinal cord injury, such as NMOSD.  Tr. 268.  Dr. Sriram testified that he reviewed petitioner's neurological medical records, and he testified that he relied on those notes to form his opinion about the onset of petitioner's condition, but then stated, "I mean, they didn't come to the diagnosis of NMO, and they sort of overlooked the serological test, and it only came into view six months later on when she developed the lesions in the thoracic spine. *Then we put the two and two together and said, well what she had in October was most likely her first event*."  Tr. 266

---

[13] Zhao, S. et al., *Neuropathic Pain in Neuromyelitis Optica Affects Activities of Daily Living and Quality of Life,* 20(12) Mult. Scel. J. 1658-61 (2014).  [Resp't. Ex. F, Tab 1].

(emphasis added).  Dr. Sriram also acknowledged that petitioner's treating physicians were not considering a neurological autoimmune condition for the first ten days post-vaccination.  Tr. 268.  Regardless of these admissions, Dr. Sriram maintained that petitioner's NMOSD began prior to the vaccination.  Tr. 269.

### B)  Opinion related to vaccine causation

Dr. Sriram also opined that the flu vaccine could not have caused petitioner's NMOSD because "there is no evidence that the influenza vaccination leads to the development of an autoimmune response directed toward the aquaporin-4 antigen causation an inflammatory response in the spinal cord."  Resp't. Ex. A at 4.

Dr. Sriram stated that he accepts molecular mimicry as a viable, plausible, and well-respected medical theory by which autoimmune diseases can be triggered.  Tr. 242.  He stated that molecular mimicry has "been better seen in the experimental models, but not in clinical medicine, save a few [examples]."  Tr. 242.

Dr. Sriram acknowledged that vaccines can trigger autoimmune diseases and gave the examples between the swine flu vaccine from 1976 and GBS and the rabies vaccine and autoimmune encephalitis.  Tr. 241.  He stated, "there are many vaccines that are known to cause neurological disease."  *Id.*  Dr. Sriram also stated that the "Institute of Medicine requires a six-week window" as an acceptable link to a vaccine and an autoimmune condition.  *Id.*[14]  Dr. Sriram also agreed that the onset of symptoms of 12 to 14 days post-vaccination would also be a reasonable timeframe "to link a vaccine to an autoimmune disease."  *Id.*

Dr. Sriram also opined that if the onset of petitioner's NMOSD was found to be two days post-vaccination, that would be too soon to infer vaccine causation.  Resp't. Ex. E at 4; Resp't. Ex. F at 3; Tr. 272.  In his third report, Dr. Sriram stated, "Even if we agree that the onset of symptoms of NMO (pain in shoulder) occurred within two days, there is insufficient evidence to support the idea that the increase in antibody titers to influenza caused the worsening of an NMO."  Resp't. Ex. F at 3.  He acknowledged that the Shoenfeld article showed some GBS cases occurring two days after vaccination and stated, "I think it can happen, but an extreme rarity."  Tr. 274.  When he was asked about the association between the flu vaccine and NMOSD in the Cho article, Dr. Sriram testified that the patient described in the Cho case report was postpartum, which was "more likely a cause for…the development of the NMO rather than the vaccine."  Tr. 275; *citing* Pet'r. Ex. 24.  He testified that it was a "well known fact in 2018, there were published reports on an increased risk of relapses in NMO often in postpartum."  Tr. 275.  However, when asked by the Court if the case report in Cho was a "relapse" or new onset, Dr. Sriram characterized the Cho patient's onset as "the first relapse."  Tr. 232.  He agreed that the authors of Cho did not actually discuss postpartum being the cause of the patient's NMO, but stated, "The fact that they didn't allude to that is a little disappointing."  Tr. 275, 276.

---

[14] For clarity Dr. Sriram was referring to a six week window as the outside limit for vaccine causation which he agreed was not inviolate but he was not testifying that it would take six weeks for an immune cross response.

24

Ultimately, Dr. Sriram opined that the flu vaccine was not the cause of petitioner's diagnosed NMOSD and even if her symptoms began two days after the receipt of the vaccine, her NMOSD had begun prior to the vaccination. Resp't. Ex. E at 4; Resp't. Ex. F at 4; Tr. 269.

### 2. Dr. Thomas Forsthuber

Dr. Forsthuber offered his opinion against vaccine causation in two expert reports and testified at the entitlement hearing. Resp't. Exs. C & G.[15] The focus of Dr. Forsthuber's opinion was regarding vaccine causation and petitioner's proposed mechanism for how the flu vaccine could cause NMOSD and he deferred to Dr. Sriram on petitioner's clinical diagnosis.

Dr. Forsthuber stated that molecular mimicry "is a concept that's well accepted in the field," but Dr. Steinman's theory of molecular mimicry between the flu vaccine and aquaporin-4 is not sound and reliable. Tr. 295. He testified that there are known molecularly mimic examples, including between group A *streptococcus* M protein and the cardiac myosin, *campylobacter pylori* and Guillain-Barre syndrome (explaining that the mimic is between a liposaccharide and a similar lipid in sugar on the peripheral nerve myelin), or even between the Epstein Barr virus and glialCAM protein resulting in MS. Tr. 324. Dr. Forsthuber distinguished the Epstein-Barr and glialCAM protein finding from the BLAST search done by Dr. Steinman in this matter, stating that Dr. Steinman's MS-EBV research and finding was a result of identifying the antibody that reacted against EBV and also bound to the glialCAM protein. Tr. 326. Later in the hearing, Dr. Forsthuber conceded that proving molecular mimicry in humans would be difficult. Tr. 345. However, Dr. Forsthuber argued that Dr. Steinman's three step process to validate molecular mimicry between the flu vaccine and aquaporin-4 was unreliable. Resp't. Ex. G at 21; Tr. 296.

First, Dr. Forsthuber criticized Dr. Steinman's use of the Basic Local Alignment Search Tool (BLAST) to identify sequence homology between aquaporin-4 and the influenza B as overly broad. Tr. 329-330. Dr. Forsthuber explained that BLAST searches can identify sequence proteins between different molecules, but argues that it was never intended to "identify immunological relationships," between proteins found in viruses or bacteria and humans. *Id.* at 2. In his responsive report to Dr. Steinman's theory and during the hearing, Dr. Forsthuber discussed the importance of the "E-value" in BLAST searches, and criticized Dr. Steinman's BLAST search between aquaporin-4 and influenza B as having too low of an E-value such that "it fails to achieve statistical significance." Resp't. Ex. G at 7. Dr. Forsthuber argued that BLAST searches can identify significant similarities between proteins, but Dr. Steinman was only able to identify molecular mimics once he changed the parameters to the E-value such that the value was not statistically significant. Resp't. Ex. G at 6-7; Tr. 330.

When Dr. Forsthuber was asked how he would identify an amino acid sequence between a vaccine and an autoimmune condition, he responded that he would do a BLAST search. Tr. 405. Dr. Forsthuber also testified that doing both BLAST searches and searches in IEDB would

---

[15] Dr. Forsthuber's first expert report responds to an expert report authored by Dr. Christina Price, who also posited a theory of molecular mimicry. *See* Pet'r. Ex. 22. However, Dr. Price did not continue as the immunology expert in this matter and therefore, the undersigned will focus on Dr. Forsthuber's opinion relating to the theory of vaccine causation proposed by petitioner's experts, Drs. Willer and Steinman.

be a reasonable "first step" to "begin to test your hypothesis" to determine if molecular mimics exist, but then to test the hypothesis, studies of the blood of human patients with autoimmune diseases would be the next step.  Tr. 410-11.

Then Dr. Forsthuber argued that Dr. Steinman's second step in his theory that neuroinflammation can be triggered even when there is only 5 out of 12 amino acids shared between the viral peptide and the human antigen, is unreliable.  Resp't. Ex. G at 11; Tr. 331.  Dr. Forsthuber asserted that Dr. Steinman's second step is reliant upon knowing which amino acids of immunogenic aquaporin-4 peptides activate T-cells through their receptors, and that these peptides also need to be in a specific position to be activated.  Resp't. Ex. G at 9; Tr. 335.  Dr. Forsthuber asserted that Gautam paper Dr. Steinman relied upon shows that the researchers actually maintained two positions of amino acids while changing out the other amino acids, and therefore, the neuroinflammatory response remained.  Tr. 337.  Dr. Forsthuber testified, "therefore, you cannot simply look at this influenza peptide and say, 'I have six out of nine amino acids matching.'  That is not enough, it only matters if they are in the correct position." Tr. 337.  Dr. Forsthuber argued that it was extremely unlikely if there are a "short sequence where only a few amino acids match that something would activate an autoimmune T cell."  Tr. 339.  He testified that he "[does not] have an explanation why we get autoimmunity," but that in this case, there was "no reliable evidence that there is a similarity that could induce pathogenic T-cells."  Tr. 341.

Finally, with respect to Dr. Steinman's third step of the process, the search of IEDB for results of homology between the influenza B and aquaporin-4 was also flawed because the sequence Dr. Steinman found (TGEHAKAIG) was only *partially* contained in a much larger amino acid sequence and it cannot be determined if that sequence induced the immune response. Resp't. Ex. G at 14.  Dr. Forsthuber performed his own search of IEDB as shown in his responsive expert report, and he stated that he did not find any reports in the IEDB database that the influenza sequence Dr. Steinman found could induce an immune response.  *Id.* at 15.

During the hearing Dr. Forsthuber was asked to review the Matsuya paper, which Dr. Steinman asserted demonstrated that three out of 12 patients responded to the area of the influenza B he identified through IEDB.  Tr. 424.  Dr. Forsthuber testified that he agreed that the article showed that 3 out of 12 patients with NMO responded to the same peptide "that we have in [this] case, but that the finding was not statistically significant.  Tr. 422, 424.

With respect to onset, Dr. Forsthuber argued that even if he accepted Dr. Steinman's theory, the onset of symptoms of NMOSD one to four days post-vaccination would not be biologically plausible.  Tr. 361; *see also* Resp't. Ex. G at 18-19.  Dr. Forsthuber argued that the earliest onset of disease after vaccination based on a recall response would be five to six days. Tr. 366.  He argued that a memory T-cell response, five-day onset would be a "reasonable estimate," but for a naïve T-cell response, five-day onset would be a "conservative estimate" to see immunopathology. Tr. 367.  Dr. Forsthuber testified that for a B-cell antibody response, it would take about five days for "meaningful antibody levels."  *Id.*  He referred to the Krammer et al. article which studied antibody responses to SARS-CoV2 vaccination, and testified that the article demonstrates that the most evident antibodies to the vaccine was seen 9 to 12 days later.

Tr. 370; Resp't. Ex. G, Tab 13.[16]  The article explains that patients that had not previously been exposed to SARS-CoV2, had relatively low antibody responses until nine days post-vaccination, but those who had been previously exposed, "rapidly developed uniform, high antibody titers within days after vaccination."  Resp't. Ex. G, Tab 13 at 1.

Dr. Forsthuber testified that if petitioner had a memory response to the vaccine, as asserted by Dr. Steinman, then he would expect onset of symptoms of NMOSD earlier than 12 days post-vaccination, as Dr. Willer suggested.  Tr. 379.  Dr. Forsthuber reiterated if petitioner had a memory response, one would expect to see onset of an autoimmune disease five to ten days post-vaccination.  Tr. 380.

## III.    Legal Standard

## I.    Legal Standard

The Vaccine Act was established to compensate vaccine-related injuries and deaths. Section 10(a).  "Congress designed the Vaccine Program to supplement the state law civil tort system as a simple, fair and expeditious means for compensating vaccine-related injured persons. The Program was established to award 'vaccine-injured persons quickly, easily, and with certainty and generosity.'"  *Rooks v. Sec'y of Health & Human Servs.,* 35 Fed. Cl. 1, 7 (1996) (quoting H.R. No. 908 at 3, *reprinted in* 1986 U.S.C.C.A.N. at 6287, 6344).

A petitioner bears the burden of establishing his or her entitlement to compensation from the Vaccine Program.  The burden of proof is by a preponderance of the evidence.  Section 13(a)(1).

### a. Factual Issues

A petitioner must prove, by preponderance of the evidence, the factual circumstances surrounding her claim.  §13(a)(1)(A).  To resolve factual issues, the special master must weigh the evidence presented, which may include contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Hum. Servs.,* 3 F.3d 415,417 (Fed. Cir, 1993) (explaining that a special master must decide what weight to give evidence including oral testimony and contemporaneous medical records).  Contemporaneous medical records in general, warrant consideration as trustworthy evidence."  *Curcuras v. Sec'y of Health & Hum. Servs.,* 993 F.2d 1525, 1528 (Fed. Cir. 1993).  But see *Kirby v. Sec'y of Health & Hum. Servs.,* 997 F.3d 1378, 1382 (Fed. Cir. 2021) (rejecting the presumption that "medical records are accurate and complete as to all the patient's physical conditions"); *Shapiro v. Sec'y of Health & Hum. Servs.,* 101 Fed. Cl. 532, 538 (2011) ("[T]he absence of a reference to a condition or circumstances is much less significant than a reference which negates the existence of the condition or circumstance.") (quoting *Murphy v. Sec'y of Health & Hum. Servs.,* 23 Cl. Ct. 726,733 (1991), *aff'd per curiam,* 968 F.2d 1226 (Fed. Cir. 1992)), *recons. den'd after remand,* 105 Fed. Cl. 353 (2012), *aff'd mem.* 503 F. App'x 952 (Fed. Cir. 2013).

---

[16] Krammer, F. et al., *Antibody Responses in Seropositive Persons after a Single Dose of SARS-CoV-2 mRNA Vaccine,* Correspondence N. Engl. J. Med. (2021).  [Resp't. Ex. G, Tab 13].

There are situations in which compelling testimony may be more persuasive than written records, such as where records are deemed to be incomplete or inaccurate. *Campbell v. Sec'y of Health & Hum. Servs.,* 69 Fed. Cl. 775,779 (2006) ("[L]ike any norm based upon common sense and experience, this rule should not be treated as an absolute and must yield where the factual predicates for its application are weak or lacking."); *Lowrie v. Sec'y of Health & Hum. Servs.,* No. 03-1585V, 2005 WL 6117475, at *19 (Fed. Cl. Spec. Mstr. Dec. 12, 2005 ("[W]ritten records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." (quoting *Murphy v. Sec'y of Health & Hum. Servs.,* 23 Cl. Ct. 726,733 (1991), *aff'd per curiam,* 968 F.2d 1226 (Fed. Cir. 1992)). Ultimately, a determination regarding a witness's credibility when determining the weight that such testimony should be afforded. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367,1379 (Fed. Cir. 2009); *Bradley,* 991 F.2d 1575.

Despite the weight afforded to medical records, special masters are not bound rigidly by those records in determining onset of a petitioner's symptoms. *Valenzuela v. Sec'y of Health & Hum. Servs.,* No. 90-1002V, 1991 WL 182241, at *3 (Fed. Cl. Spec. Mstr. Aug. 30,1991); *see also Eng v. Sec'y of Health & Hum. Servs.,*No. 90-1754V, 1994 WL 67704, at *3 (Fed. Cl. Spec. Mstr. Feb. 18, 1994) (Section 13(b)(2) "must be construed so as to give effect also to §13(b)(1) which directs the special master or court to consider the medical records (reports, diagnosis, conclusions, medical judgment, test reports, etc.), but does not require the special master or court to be bound by the,").

Relevant to this inquiry, the Vaccine Act provides that a special master must consider the record as a whole including any medical diagnosis contained therein. Section 300aa-13(b)(1). However, no diagnosis in the medical records is "binding on the special master." *Id.* Rather, "[i]n evaluating the weight to be afforded to any such diagnosis… the special master… shall consider the entire record and the course of the injury, disability, illness, or condition until the date of the judgment of the special master." *Id.* The special master shall also consider any expert opinions and additional medical scientific evidence in the record. *Id.*

### b. Causation

A petitioner may prevail by proving either that (1) the vaccinee suffered an injury listed on the Vaccine Injury Table with onset beginning within a corresponding time period following receipt of a corresponding vaccine (a "Table Injury"), for which causation is presumed or that (2) the vaccinee suffered an injury that was actually caused by a vaccine. Under either method, however, the petitioner must also show that the vaccinee "suffered the residual effects or complications of the illness, disability, injury, or condition for more than six months after the administration of the vaccine." Section 11(c)(1)(D)(i).

In the present case, petitioner does not and cannot allege a Table injury. Thus, he bears the burden of establishing actual causation. To do so, he must "show by preponderant evidence that the vaccination brought about the injury by providing 1) a medical theory connecting the vaccination and injury; 2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and 3) a showing of proximate temporal relationship between vaccination and injury." *Althen v. Sec'y of Health & Human Servs.,* 418 F. 3d 1274, 1278 (Fed.

Cir. 2005).  There must be preponderant evidence for each *Althen* prong.  *Caves v. Sec'y of Health & Human Servs.,* 100 Fed. Cl. 119, 132 (2011), *aff. per curiam,* 463 Fed. Appx. 932 (Fed. Cir. 2012).

Under *Althen* prong one, the causation theory must relate to the injury alleged.  Thus, a petitioner must provide a "reputable" medical or scientific explanation that the vaccine received *can cause* the type of injury alleged.  *Pafford*, 451 F.3d at 1355-56.  The theory must be based on a "sound and reliable medical or scientific explanation."  *Knudsen*, 35 F.3d at 548.  It must only be "legally probable, not medically or scientifically certain."  *Id.* at 549.  However, the theory still must be based on a "sound and reliable medical or scientific explanation."  *Id.* at 548.  The Federal Circuit explained in *Althen* that "while [that petitioner's claim] involves the possible link between [tetanus toxoid] vaccination and central nervous system injury, *a sequence hitherto unproven in medicine*, the purpose of the Vaccine Act's preponderance standard is to allow the finding of causation in a field *bereft of complete and direct proof of how vaccines affect the human body."*  *Althen,* 418 F.3d at 1280 (emphasis added).  Recently in *Doles,* the Federal Circuit clarified that a petitioner does not need to proffer a theory that is grounded in medical certainty and backed by medically certain (statistically significant) evidence.  *Doles v. Sec'y of Health & Hum. Servs.,* No. 17-642, 2025 WL 1177875 (Fed. Cir. Apr. 23, 2025), (citing *Andreu ex rel. v. Sec'y of Health & Hum. Servs.,* 569 F.3d 1367, 1380 (Fed. Cir. 2009) ("In medical research, "attribution of causation is typically not made until a level of *very near certainty—* perhaps 95% probability—is achieved.  In contrast, "determination of causation in fact under the Vaccine Act involves ascertaining whether a sequence of cause and effect is 'logical' and legally probable, not medically or scientifically certain.").

Under *Althen* prong two, petitioner must prove "a logical sequence of cause and effect showing that the vaccination was the reason for [her] injury."  *Althen*, 418 F.3d at 1278.  This prong is sometimes referred to as the "did it cause" test; i.e. in this particular case, did the vaccine(s) cause the alleged injury.  *Broekelschen,* 618 F. 3d at 1345 ("Because causation is relative to the injury, a petitioner must provide a reputable medical or scientific explanation that pertains specifically to the petitioner's case").  Temporal association alone is not evidence of causation.  *See Grant v. Sec'y of Health & Human Servs.,* 9556 F.2d 1144, 1148 (Fed. Cir. 1992).  This sequence of cause and effect is usually supported by facts derived from petitioner's medical records.  *Althen,* 418 F.3d at 1278; *Andreu*, 569 F.3d at 1375-77; *Capizzano*, 440 F.3d at 1326; *Grant*, 956 F.2d at 1148.

*Althen* prong three requires establishing a "proximate temporal relationship" between the vaccination and the injury alleged.  *Althen* at 1281.  That term has equated to the phrase "medically-acceptable temporal relationship."  *Id.*  A petitioner must offer "preponderant proof that the onset of symptoms occurred within a timeframe which, given the medical understanding of the disorder's etiology, it is medically acceptable to infer causation."  *de Bazan v. Sec'y of Health & Human Servs.,* 539 F.3d 1347, 1352 (Fed. Cir. 2008).  The explanation for what is medically acceptable timeframe must align with the theory of how the relevant vaccine can cause an injury (*Althen* prong one).  *Id.* at 1352.

The preponderance of the evidence standard requires the petitioner to demonstrate that it is "more likely than not" that the vaccine caused the injury.  *Moberly v. Sec'y of Health &*

*Human Servs.,* 592 F.3d 1315, 1322 n.2 (Fed. Cir. 2010). Proof of medical certainty is not required. *Bunting v. Sec'y of Health & Human Servs.,* 931 F.2d 867, 873 (Fed. Cir. 1991). A petitioner must demonstrate that the vaccine was "not only [a] but for cause of the injury but also a substantial factor in bringing about the injury." *Moberly,* 592 F.3d at 1321 (quoting *Shyface v. Sec'y of Health & Human Servs.,* 135 F.3d 1344, 1352-53 (Fed. Cir. 1999); *Pafford v. Sec'y of Health and Human Servs.,* 451 F.3d 1352, 1355 (Fed. Cir. 2006). Causation is determined on a case-by-case basis, with "no hard and fast *per se* scientific or medical rules." *Knudsen v. Sec'y of Health & Human Servs.,* 35 F.3d 543, 548 (Fed. Cir. 1994). A fact-finder may rely upon "circumstantial evidence" which is consistent with the "system created by Congress, in which close calls regarding causation are resolved in favor of injured claimants." *Althen,* 418 F. 3d at 1280.

The petitioner often presents expert testimony in support of his or her claim. *Lampe v. Sec'y of Health & Human Servs.,* 219 F.3d 1357, 1361 (Fed. Cir. 2000). Expert testimony in the Vaccine Program is usually evaluated according to the factors set forth in *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 594-96 (1993); *see also Cedillo,* 617 F.3d at 1339 (citing *Terran v. Sec'y of Health & Human Servs.,* 195 F.3d 1302, 1316 (Fed. Cir. 1999). A special master may use the *Daubert* framework to evaluate the reliability of expert testimony, but expert testimony need not meet each *Daubert* factor to be reliable. *Boatmon v. Sec'y of Health & Human Servs.,* 941 F.3d 1351 (Fed. Cir. 2019). The *Daubert* factors are "meant to be helpful, not definitive," and all factors "'do not…necessarily apply even in every instance in which the reliability of scientific testimony is challenged.'" *Boatmon,* 941 F. 3d at 1359 (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 151, 119 S. Ct. 1167, 143 L.Ed.2d 238 (1999). Thus, for Vaccine Act claims, a "special master is entitled to require some indicia of reliability to support the assertion of the expert witness." *Moberly* at 1324. Where both sides offer expert testimony, a special master's decision may be "based on the credibility of the experts and the relative persuasiveness of their competing theories." *Broekelschen v. Sec'y of Health & Human Servs.,* 219 F.3d 1339, 1347 (Fed. Cir. 2010) (citing *Lampe,* 219 F.3d 1357 at 1362).

If the petitioner makes a *prima facie* case supporting vaccine causation-in-fact, the burden shifts to respondent to show by a preponderance of the evidence that the injury is instead due to factors unrelated to the administration of the vaccine. *Deribeaux v. Sec'y of Health & Human Servs.,* 717 F.3d 1363, 1367 (Fed. Cir. 2013) (citing Section 13(a)(1)(B)). Respondent has the burden of demonstrating that: "[A] factor unrelated to the vaccination is the more likely or principal cause of injury alleged. Such a showing establishes that the factor unrelated, not the vaccination, was 'principally responsible' for the injury. If the evidence or alternative cause is seen in equipoise, then the government has failed in its burden of persuasion and compensation must be awarded." *Knudsen,* 35 F.3d at 551.

## IV.    Analysis

### a) Onset of Petitioner's NMOSD Symptoms

#### 1) Petitioner's Symptoms of Neck and Left Shoulder Pain Began One Day after the October 8, 2014 Vaccination

30

In this matter, the parties agree that petitioner was diagnosed with NMOSD, as confirmed by her aquaporin-4 antibody finding, but dispute when the onset of her condition began.  Pet'r. Br. at 1; Resp't. Br. at 9.

Petitioner argued that the onset of her symptoms attributable to her NMOSD began "12 to 14 days post-vaccination, but no sooner than three days after she received the flu vaccine." Pet'r. Br. at 93.  Petitioner asserted that the neck pain she experienced was documented only *after* the vaccination and that it is unclear if her initial complaints of neck and left shoulder pain are attributable to the later diagnosed NMOSD or a transient injection site injury unrelated to her ultimate diagnosis, such as a SIRVA or brachial neuritis.  *Id.* at 88-91.

Respondent argued that petitioner's initial symptoms of NMOSD was left sided neck pain which began prior to the vaccination or at least one day post-vaccination.  Resp't. Br. at 8; *see also* Tr. 225-29, 247-48.  Respondent argued that petitioner's initial neck pain was a prominent feature of her NMOSD, that was well documented as beginning prior to vaccination, and her initial symptoms of neck pain and left shoulder pain were not separate injuries but features of her NMOSD.  Resp't. Br. at 13-14.

The undersigned finds that there is preponderant evidence that petitioner's neck pain began one day after the October 8, 2014 flu vaccination and that her neck and left arm pain were consistent with her later diagnosed NMOSD.  The finding that petitioner's neck and left shoulder pain began after the October 8, 2014 is based on the contemporaneous medical records and her testimony during the hearing.

Petitioner's treatment records demonstrate that onset of neck and left shoulder pain began after the vaccination and no record indicates that the onset of neck or shoulder pain began prior to the October 8, 2014.  *See* Pet'r. Ex. 4 at 32.  The closest appointments to her vaccination at Physicians Neck and Back Center were on September 18, 2014 and October 6, 2014, neither which included documentation of reported neck pain or treatment for neck pain.  Pet'r. Ex. 4 at 32.  During the hearing, Dr. Sriram acknowledged that these treatment records do not document any neck or shoulder pain.  Tr. 259-60.

To formulate his opinion that petitioner's symptoms began prior to the vaccination, Dr. Sriram relied heavily on the records from Physicians Neck and Back Center that were created in December 2014.  However, these records include internal inconsistencies and also conflict with other, more reliable contemporaneously created medical records.  The Neck and Back Institute record from December 9, 2014 written by Dr. Sturm states:

> [Petitioner] dates her symptoms to 9/28/2014….[Petitioner] underwent 17 sessions in the lumbar program and found that to be helpful.  She began treatment on July 31, 2014.  Her last treatment was October 16, 2014.  She stopped coming because she developed cellulitis of the face.  This ultimately turned out to be Lyme disease.  She also received a flu shot and came down with a form of Guillain-Barre syndrome.

Pet'r. Ex. 4 at 14.  Importantly, this records state that petitioner stopped treatment when she developed cellulitis, which is inconsistent with petitioner's treatment records for her

31

cellulitis, but also with the internal treatment records from the same office.  Pet'r. Ex. 4 at 32 (9/18/2014: Pt feeling worn down from cellulitis); *see also* Pet'r. Ex. 5 at 18 (appointment from 9/17/2014 for swollen right ear, diagnosed with cellulitis).  Next, the December 19, 2014 record from Physician Back and Neck also incorrectly records petitioner's date of vaccination, indicating that the "Onset" of petitioner's symptoms began "9/28/14-after flu shot, then the Lyme/GB."  Pet'r. Ex. 4 at 39.

Respondent also argued that petitioner's records from her initial emergency department visit on October 18, 2014, and her appointment with PA-C Rydlund on October 20, 2014, include histories that describe the neck pain being present for a month, and pre-dating her vaccination.  Resp't. Br. at 10-11.  The note taken by RN Cody on October 18, 2014 states, "Patient reports recent history of neck/facial cellulitis which was treated and improved, though pain has never completely gone away."  Pet'r. Ex. 7 at 3.  Then on October 20, 2014 the treating emergency room physician, Dr. Roline took petitioner's history and writes:

> …one month ago [petitioner] started to develop some right-sided facial swelling and cellulitis.  It ended up spreading toward her right ear.  She was treated with antibiotics and that seemed to resolve.  However, over this timeframe, she has had some neck discomfort.  It has been worse in the back of her neck, slightly more to the left. With some intermittency she gets some radiating pain up the back of her head.  She tells me that has been present over a month.  In addition, her neck has felt stiff.  She has been taking some ibuprofen which has been helping, but over the last few days, she has been more uncomfortable.

Pet'r. Ex. 7 at 3.  These notations are vague at best as to when petitioner's neck pain began.  Both records discuss the treatment for petitioner's cellulitis, which is consistent with her other medical records, but are imprecise as to the exact onset of her neck pain.

Similarly, the record from October 20, 2014 with PA-C Rydlund also appears to combine petitioner's cellulitis symptoms and her new symptoms of neck and shoulder pain.  The record from October 20, 2014 states, "50-year old female here today for neck pain.  She feels it has been present ever since her bout of cellulitis about 4 weeks ago, however, the cellulitis did improve."  Pet'r. Ex. 5 at 15.  However, both records do indicate some *new* onset of neck pain being left sided.  *See* Pet'r. Ex. 7 at 3 ("It has been worse in the back of her neck, slightly more to the left….but over the last few days she has been more uncomfortable."); Pet'r Ex. 5 at 15 ("Acute worsening two days ago.").

During the hearing, petitioner credibly explained that when she initially went to the emergency department on October 18, 2014, she thought her neck pain was related to her cellulitis.  Tr. 62.  She testified, "…my only thought at that point was that this must be related to the cellulitis, although in hindsight the cellulitis was on the right side of my face, my ear basically, and that was kind of where it was localized.  And the pain I was having now on my left side and into my neck."  *Id.*

Petitioner testified that she did not experience any left sided neck or shoulder pain prior to vaccination.  Tr. 64-65.  She testified that the day after the vaccination, her neck and left

32

shoulder began to hurt, and she decided to get a massage before visiting friends from out of town. Tr. 64-65. Petitioner stated that two days after the vaccination, she began to take Tylenol and Ibuprofen for her pain. Tr. 12. She testified that her pain was "persistent through that first weekend," and by the end of the weekend she was "taking Tylenol and ibuprofen probably every 8 hours, each of them, to try to control the pain." Tr. 13. The Saturday of that weekend was October 11, 2014.

Petitioner's testimony that her neck and left shoulder pain began after her vaccination does not conflict with the majority of her records. For example, on October 23, 2014, petitioner went to Twin City Orthopedics and reported "shoulder pain and weakness for two weeks." Pet'r. Ex. 8 at 8. This timeline would put onset of left shoulder pain to one day after the vaccination, consistent with petitioner's testimony. Then on October 24, 2014 when petitioner went back to the Maple Grove emergency department, the record indicates that petitioner was having neck and left shoulder pain that began "after receiving the influenza vaccine." Pet'r. Ex. 7 at 26. Petitioner explained to emergency physician, Dr. Brooks that her shoulder and neck pain "has been going on for some time, what she believes is since a flu shot she had in her left deltoid." *Id.* at 28. On October 26, 2014, the "History of Present Illness" provides that petitioner was seeking an evaluation for "left shoulder pain," and that "The onset was 16 days ago." (October 10, 2014)Pet'r. Ex. 7 at 48. The note also states, "The quality is described as onset of pain two days after a flu vaccine place[d] unusually high in the left shoulder." *Id.*

Petitioner was evaluated by Dr. Rodney McFadden the same day, Sunday, October 26, 2014, and the "History of Present Illness" provides, "The patient states that she received a flu vaccine approximately 18 days ago and then approximately 16 days ago she developed left shoulder pain. Of note, the patient states that she received the flu vaccine in her upper shoulder at a higher location than is usually given…On Wednesday of this week, (which was October 22) the patient began noticing left arm weakness. On Thursday, she could not abduct her arm above mid chest and subsequently the weakness has progressed so at the present time she can only abduct her arm up approximately 45 degrees." *Id.* at 54. Finally, when petitioner first saw neurologist, Dr. Altafullah on October 27, 2014 during her hospitalization, the "History of Present Illness" also indicates that petitioner's left shoulder pain began after the flu vaccination. *See* Pet'r. Ex. 6 at 1.

The Mayo Clinic records from August 2015, also support an onset of her NMOSD symptoms beginning after her flu vaccination. At her first appointment with Dr. Pittock on August 11, 2015, the record states, "On October 8, 2014, she had a flu vaccination; two days later, she developed pain in her left shoulder and neck." Pet'r. Ex. 10 at 1. This history is repeated to neurologist, Dr. Alfugham, on August 14, 2015, "October 8, 2014: received flu vaccine. The second day, patient started to have severe pain and paresthesia in the left shoulder region." Pet'r. Ex. 10 at 12.

Medical records generally "warrant consideration as trustworthy evidence." *Cucuras,* 993 F.2d at 1528. However, greater weight is typically given to contemporaneous records. *Vergara v. Sec'y of Health & Hum. Servs.,* No. 08-882V, 2014 WL 2795491, at *4 (Fed. Cl. Spec. Mstr. May 15, 2014) ("Special Masters frequently accord more weight to contemporaneously-recorded medical symptoms than those recorded in later medical histories,

33

affidavits or trial testimony."). However, there are situations in which compelling oral testimony may be more persuasive than written records, such as where records are deemed to be incomplete or inaccurate. *Campbell v. Sec'y of Health & Hum. Servs.*, 69 Fed. Cl. 775, 779 (2006) ("[L]ike any norm based upon common sense and experience, this rule should not be treated as an absolute and must yield where the factual predicates for its application are weak or lacking."); *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475, at \*19 (Fed. Cl. Spec. Mstr. Dec. 12, 2005) ("Written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." (quoting *Murphy,* 23 Cl. Ct. *at 733)).* Ultimately, a determination regarding a witness's credibility is needed when determining the weight that such testimony should be afforded. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009)*; Bradley,* 991 F.2d at 1575.

Taken as a whole, petitioner's medical records and her testimony support a finding that the onset of her NMOSD began one day after her October 8, 2014 flu vaccination, not before as opined by Dr. Sriram.

### 2) Petitioner's Neck and Left Shoulder Pain were Consistent with her NMOSD Diagnosis

The second factual issue is if petitioner's neck and left shoulder pain were consistent with her NMOSD diagnosis or a transient injection site reaction, such as a SIRVA, or a brachial neuritis.

Neuromyelitis optica is described as a demyelinating disease of the central nervous system characterized by recurrent optic neuritis and acute transverse myelitis. Resp't. Ex. A, Tab 2; Pet'r. Ex. 48(a) at 1. Typical features of NMOSD include ocular pain with loss of vision and myelitis with severe symmetric paraplegia, sensory loss below the lesion, and bladder dysfunction. Resp't Ex. A, Tab 2 at 2. Common treatments include intravenous corticosteroid therapy for acute attacks of optic neuritis or myelitis. *Id.* at 8. Dr. Willer described the "classical symptoms" of NMOSD as "painful eye movements, blurry vision, transverse myelitis," and that a patient would present with "paraparesis, quadriparesis—depending on the level affected---dysesthesias, numbness, tingling, burning, really painful unpleasant tingling sensations, [and] potentially bowel and bladder involvement depending on which level is affected." Tr. 88. Consistent with the medical literature, Dr. Willer testified that neuromyelitis optica includes longitudinally extensive transverse myelitis, which he described as "long lesions which span three or more levels [of the spinal cord]." Tr. 89; *see also* Pet'r. Ex. 14 at 1.[17]

In his written expert reports, Dr. Willer repeatedly associated her neck and shoulder pain to the onset of her NMOSD but later testified that these complaints could have been related to a transient injection site injury or brachial neuritis. *See* Pet'r. Ex. 12 at 8; Pet'r Ex. 21 at 3; Pet'r. Ex. 32 at 2; Tr. 111-14. However, he was unable to render his opinion about whether she had an injection site injury or brachial neuritis to a degree of reasonable certainty. Pet'r. Br., at 92; *see also* Tr. 85-86; 130. He stated that "on a more likely than not basis," petitioner's symptoms of NMOSD can be established by October 20th or 22nd. Tr. 130.

---

[17] Wingerchuk, D. et al., *International Consensus Diagnostic Criteria for Neuromyelitis Optica Spectrum Disorders,* 85 Neurol. 177-189 (2015). [Pet'r. Ex. 14].

Respondent's expert, Dr. Sriram, opined that the neck and left arm pain petitioner experienced were the first symptoms of her NMOSD, based on the characteristics of her pain, the response to treatment, and the continued presence of those symptoms during repeat NMOSD attacks.  Resp't. Br. at 12-14; *see generally* Resp't. Ex. F at 2.  He testified that petitioner's initial neck pain then began to radiate down her left arm and appeared with tingling.  Tr. 227.  Dr. Sriram explained that when petitioner received steroids, her pain improved, which suggested an inflammatory component to the pain.  Tr. 227.  Dr. Sriram stated that predominant symptoms of NMOSD are weakness and pain, which may include paresthesias, but the predominant effect of the spinal cord inflammation is weakness.  Tr. 245.  While Dr. Sriram's opinion that the onset of petitioner's NMOSD began prior to the October 8, 2014 vaccination has no support in the record, he conceded that the contemporaneous treatment records do not document neck pain or left shoulder pain prior to the vaccination.  Tr. 262.  But he maintained that petitioner's neck and left arm pain were the first symptoms of her NMOSD which is supported in her medical record and testimony, as well as the medical literature.  Tr. 248; *see also* Resp't. Ex. F at 2.

Based on the medical records, the expert opinions offered, and the medical literature, the undersigned finds that petitioner's initial neck and left shoulder pain were related to her NMOSD, beginning on October 9, 2014, one day after she received the flu vaccination.

Petitioner's medical records demonstrate that her neck pain and left shoulder pain represented the onset of her NMSOD, as there was no break between the onset of those symptoms and the neurological symptoms she experienced later, including left upper extremity weakness and paresthesia, and eventually lower-limb weakness associated with her later discovered transverse myelitis.  The first documentation of petitioner's neck pain appeared in the October 9, 2014 treatment note at Physicians Neck and Back, where she had been receiving physical therapy for her lower back.  The note stated, "neck pain greater than lower back pain; sleeping in different positions due to her cellulitis.  Pet'r. Ex. 4 at 32.  Then approximately 11 days later, petitioner's neck and left shoulder pain were persistent enough that she went to the emergency department on October 18, 2014.  Tr. 15; *see also* Pet'r. Ex. 7 at 3.  Two days later, on October 20, 2014, petitioner reported "pain in her neck," which "radiates down to about the level of her scapula and it also radiates to her left shoulder."  Pet'r. Ex. 5 at 15.  Petitioner also reported "brief left-hand tingling" at this appointment.  *Id.*  When petitioner returned to PA Rylund on October 22, 2014, in addition to acute neck pain, petitioner was now unable to lift her left arm.  *Id.* at 12.  At her emergency department visits on October 24th and October 26th, she again reported pain localized in her neck and left shoulder.  *See* Pet'r. Ex. 7 at 28 (left shoulder and neck pain "has been doing on for some time, what she believes is since a flu shot she had in her left deltoid.");  *Id.* at 54 (Chief complaint: left arm pain and weakness).  By her October 26, 2014 hospitalization, she was reporting bilateral paresthesia in her upper extremities, bowel symptoms even though she was using laxatives, and had a band of numbness and tingling around her mid-abdomen.  Pet'r. Ex. 7 at 54, 63.

Petitioner also testified that her neck pain and left arm pain were continuous, beginning the day after the vaccination, which then progressed to neurological symptoms, such as numbness and tingling and weakness in her left upper extremity.  Tr. 13, 24. She testified that her neck and arm pain were "persistent through the first weekend," and that Tylenol and

Ibuprofen were ineffective at controlling her pain.  Tr. 13.  By the time petitioner saw PA Rylund on October 22, 2014, two days after she was first prescribed the oral steroids, she was unable to lift her left arm and the "pain was intense."  Tr. 18.  Petitioner stated that she could not actively lift her arm by October 22, 2014, and she was also having numbness and tingling in her left arm as well.  *Id.*  She testified that by October 26, 2014, "there was just no relief from the pain.  It was constant. The numbness, tingling sensation in my left arm was constant."  Tr. 28.  Additionally, petitioner testified that after her hospitalization at North Memorial, when she was treated with IVIG, her symptoms improved, but she still had the band of paresthesia around her abdomen.  Tr. 42.

Additionally, petitioner's neck pain, along with predominantly left sided symptoms, were consistent with her later relapses of NMOSD.  At her follow-up with Dr. Altafullah on February 25, 2015, petitioner reported a "burning pain in her lower neck, upper back that really radiates all the way down her mid-and-low back."  Pet'r. Ex. 6 at 27.  Petitioner was also having difficulty lifting her left arm more than her right.  *Id.* Dr. Pittock thought that petitioner's symptoms in February 2015 represented a relapse of her NMOSD.  When she was evaluated at the Mayo Clinic in August 2015, petitioner reported that her main symptoms were "mild left facial numbness, some persistent neck pain, some burning sensation in her back, and some sensory symptoms in her upper extremities."  Pet'r. Ex. 10 at 1.

Petitioner's argument that the initial neck and left shoulder pain could have been associated with a possible brachial neuritis is unpersuasive.  First, both Drs. Willer and Sriram raised doubts as to whether the diagnosis of brachial neuritis was supported by petitioner's clinical picture.  Dr. Willer testified that he could not opine to a degree of medical certainty that petitioner had an injury to the brachial plexus, observing that she did not have any scapular winging, and the EMG studies failed to consider the appropriate muscles in her shoulder.  Tr. 115.  Dr. Sriram also testified that petitioner did not have any atrophy in her shoulder muscles, which is a prominent feature in brachial neuritis patients, and she was already experiencing numbness and tingling in her right arm, making the diagnosis of left brachial neuritis less likely.  Tr. 263; Resp't. Ex. F at 3.  Additionally, the Zhao article Dr. Sriram referenced, explains that neuropathic pain "is a prevalent symptom in NMO-related myelitis," and a constant complaint.  Resp't. Ex. F, Tab 1 at 4.[18]  Petitioner's pain, which appeared one day after vaccination, and then remained a continuous feature of her condition, only relieved by steroid treatment, is consistent with the description of neuropathic pain in NMOSD patients and with the development of NMOSD more generally.

Second, it appears that petitioner's diagnosis of brachial neuritis was changed after her October 30th hospitalization, when she was diagnosed with "post-vaccinal myelo-radiculitis" and treated with IVIG.  Pet'r. Ex. 6 at 22.  Lastly, Dr. Willer conceded that by the time petitioner was hospitalized for a presumptive "brachial neuritis" she was actually experiencing symptoms of her NMOSD.  He testified that her left arm weakness, which was documented on October 22nd by PA Rylund, was clearly related to her transverse myelitis.  Tr. 93 ("What came later around the 22nd is very clear.  She had weakness, she had paresthesia, she had a band-like sensation.  So that is without a doubt part of the transverse myelitis.").  It is difficult to reconcile his opinion that

---

[18] Zhao, S. et al., *Neuropathic Pain in Neuromyelitis Optica Affects Activities of Daily Living and Quality of Life,* 20(12) Mult. Scel. 1658-1661 (2014).  [Resp't. Ex. F, Tab 1].

petitioner was experiencing NMOSD symptoms by October 22nd, with the possibility that she was also experiencing a brachial neuritis.  Instead, the pain she experienced one day after vaccination was most likely the initial symptom of her NMOSD as her other neurological symptoms developed.

Similarly, petitioner's initial left shoulder pain was inconsistent with an injection-site injury.  Importantly, petitioner testified that she began to experience neck and left shoulder pain the day after her vaccination, and it continued.  Tr. 12-15.  Her pain was unresponsive to over the counter pain relief, and then later, unresponsive to stronger prescription pain medication.  Tr. 15 ("I tried…Tylenol, ibuprofen, again, I also remember I soaked in a hot tub.  Nothing seemed to be working.").  When petitioner was evaluated by two different orthopedists, petitioner did not have any pain upon passive movement of her shoulder, suggesting that an underlying musculoskeletal issue was not causing her pain.  *See* Pet'r. Ex. 8 at 11 ("She does not have significant pain with range of motion, she is able to passively move her shoulder overhead without pain."); Pet'r. Ex. 8 at 18 (Dr. O'Neil performing a physical examination and writing, "I can move her arms freely without any pain including the elbows, fingers, and shoulders bilaterally.").  Orthopedist Dr. O'Neil ruled out an orthopedic cause of her shoulder pain stating, "She has no pain with shoulder range of motion, so I do not think any shoulder injection is going to help her."  Pet'r. Ex. 8 at 19.

Finally, petitioner's neck and shoulder pain were relieved only by steroids, until she was given IVIG suggesting an immune-mediated process instead of a mechanical injury.  Petitioner was initially given a steroid prescription by PA Rylund on October 20, 2014 and when she returned two days later, petitioner reported that her pain was relieved with the first two doses of prednisone and in the morning when petitioner took another dose, her pain had improved.  Pet'r. Ex. 5 at 15.  At the emergency room on October 24, 2014, petitioner again reported that "the only time she has had improvement in symptoms is when she was on the prednisone at the higher dosage."  Pet'r. Ex. 7 at 28.  At this emergency room visit, she was given intravenous methylprednisolone and discharged with a higher oral steroid prescription.  *Id.*  When she returned two days later, on October 26, 2014, petitioner again reported, "the prednisone has improved her symptoms…the patient states the Vicodin has not improved her symptoms."  *Id.* at 60.

The record as a whole supports a finding that petitioner's initial neck pain and left shoulder pain, which began one day after her October 8, 2014 vaccination, was the initial presenting symptom of her later diagnosed NMOSD.

### b)  Vaccine Causation

In order to demonstrate entitlement for an "off-table" injury, petitioner must demonstrate all three elements established by the Federal Circuit in *Althen.*  418 F. 3d 1274, 1278.  The petitioner must establish, by preponderant evidence: (1) a medical theory causally connecting the vaccine and her injury; (2) a logical sequence of cause and effect showing that the vaccine was the reason for his injury; and (3) a showing of proximate temporal relationship between the vaccine and his injury.  418 F.3d at 1278.

In this case, petitioner's most difficult issue in proving causation is establishing *Althen* prong three and how it relates to the theory of molecular mimicry.  Petitioner must establish a "proximate temporal relationship" between the vaccination and the injury alleged.  *Althen,* 418 F.3d at 1281. A petitioner must offer "preponderant proof that the onset of symptoms occurred within a timeframe, which, given the medical understanding of the disorder's etiology, it is medically acceptable to infer causation.  *De Bazan v. Sec'y of Health & Human Servs.,* 539 F.3d 1347, 1352 (Fed. Cir. 2008).  The explanation for what is a medically acceptable timeframe must also coincide with the theory of how the relevant vaccine can cause an injury.  *Id.*; *see also Shapiro v. Sec'y of Health & Human Servs.,* 101 Fed. Cl. 532, 542 (2011), *recons. denied after remand,* 105 Fed. Cl. 353 (2012), *aff'd mem*., 2013 WL 1896173 (Fed. Cir. 2013); *Koehn v. Sec'y of Health & Human Servs.,* No. 11-355V, 2013 WL 3214877 (Fed. Cl. Spec. Mstr. May 30, 2013), *mot. for review denied* (Fed. Cl. Dec. 3, 2013), *aff'd*, 773 F.3d 1239 (Fed. Cir. 2014).

Petitioner's expert, Dr. Steinman, posited a theory of molecular mimicry to explain how the flu vaccine could cause NMOSD.  Pet'r. Br. at 73; Pet'r. Ex. 33 at 16-26; Tr. 146-48.  The undersigned, like many special masters have accepted molecular mimicry as a sound and reliable theory for how the flu vaccine can cause central nervous system disease, including transverse myelitis and NMOSD.  *See Marsh v. Sec'y of Health & Hum. Servs.,* No. 17-1109V, 2025 WL 1023960, at *27-29 (Fed. Cl. Spec. Mstr. Mar. 5, 2025) (finding the theory of molecular mimicry between the HPV vaccine and optic neuritis to be sound and reliable); *Hock v. Sec'y of Health & Hum. Servs.,* No. 21-945V, 2024 WL 3826125, at *20-21 (Fed. Cl. Spec. Mstr. July 12, 2024) (accepting that molecular mimicry may stimulate the production of anti-MOG antibodies through molecular mimicry); *Reinhardt v. Sec'y of Health & Hum. Servs.,* No. 17-1257V, 2021 WL 1851491, at *16-18 (Fed. Cl. Spec. Mstr. Apr. 2, 2021); *Day v. Sec'y of Health & Hum. Servs.,* No. 12-630V, 2015 WL 8028393, at *14 (Fed. Cl. Spec. Mstr. Nov. 13, 2015) (accepting molecular mimicry as a theory for how the Flumist and Gardasil vaccines can cause neuromyelitis opticta); *Schmidt v. Sec'y of Health & Hum. Servs.,* No. 07-20V, 2009 WL 5196169, at *11 (accepting molecular mimicry as mechanism for causing transverse myelitis); *Calise v. Sec'y of Health & Hum. Servs.,* No. 08-865V, 2011 WL 1230155 (Fed. Cl. Spec. Mstr. Mar. 14, 2011) (finding that the flu vaccine can cause neuromyelitis optica).

Additionally, the medical literature filed in this case supports the mechanism of molecular mimicry for inducing NMOSD, although the articles also readily acknowledge that the exact mechanism is unknown.  *See* Resp't. Ex. C, Tab 3[19] ("The precise mechanism that underlie AQP4-IgG production, [blood-brain barrier] disruption, and oligodendrocyte injury remain unknown.").  Zhong, which explored a select number of infections for the development of AQP4 antibodies, opined, "Infectious pathogens may potentially trigger or exacerbate NMOSD in genetically predisposed individuals either through molecular mimicry, by disturbing the balance between TH1/Th17 and Tregs cells, by promoting AQP4-IgG production, or by inducing inflammatory molecules through non-specific inflammatory stimuli." *Id.* at 3.  Matsuya et al. explained that the T-cell response to AQP4 "may be due to past infection with common pathogens, which conferred immunological memory to a part of AQP4 via molecular mimicry, or to other, as yet unknown mechanisms."  Pet'r. Ex. 51 at 8.

---

[19] Zhong, X. et al., *Infections in Neuromyelitis Optica Spectrum Disorder,* 47 J. of Clin. Neuro. 14-19 (2018). [Resp't Ex. C, Tab 3].

Respondent's experts' criticism of molecular mimicry or Dr. Steinman's process in which he developed his theory are unpersuasive. Dr. Forsthuber also acknowledged that if he were to begin research to determine molecular mimics, he would utilize a BLAST search, but ultimately, he wanted to rely on animal studies or the sera of humans with autoimmune conditions. Tr. 405-08. Dr. Forsthuber's requirements for scientific certainty to demonstrate a theory is not required in the Vaccine program and impermissibly raises the burden on petitioner. *See Knudsen v. Sec'y of Health & Hum. Servs.,* 35 F.3d 543, 549 (Fed. Cir. 1994) ("to require identification and proof of specific biological mechanisms would be inconsistent with the purpose and nature of the vaccine compensation program."). Further, the Matsuya article identified NMO patients that generated an immune response to the influenza B peptide sequence Dr. Steinman identified, thus providing additional support to petitioner's theory that the flu vaccine can result in NMOSD. *See* Pet'r. Ex. 51 at 5.

But it is the relationship between petitioner's theory of molecular mimicry and the onset of her symptoms occurring one day after vaccination is problematic to her case. Even if the undersigned found that molecular mimicry is a sound and reliable theory for how the flu vaccine can cause NMOSD, a one-day onset of symptoms is not compatible with the theory, even for a recall response.

As discussed above, the record as a whole supports a finding that petitioner's NMOSD symptoms began one day after the flu vaccine. Dr. Steinman and Dr. Willer consistently opine that a two- or three-day onset after the flu vaccination would be an acceptable timeframe for symptoms of NMOSD to begin. Pet'r. Ex. 33 at 27; Pet'r. Ex. 36 at 11; *see also* Tr. 198. Dr. Steinman observed that petitioner had previously received flu vaccines and that the flu vaccine she received on October 8, 2014 was similar to the ones she had previously received, thus she would have a recall-response to the October 8, 2014, resulting in a faster development of B and T-cells. Tr. 138; Pet'r. Ex. 38 at 4. Dr. Steinman opined that because petitioner had anti-influenza antibodies circulating in her blood, those antibodies can be directed to molecular mimics of AQP-4, so "more likely than not, petitioner had circulating antibodies that are cross-reactive with AQP-4." Pet'r. Ex. 33 at 31. Dr. Steinman wrote that "in NMO the blood brain barrier is disrupted, and this would allow the pre-existing influenza antibodies that are cross-reactive with AQP-4 to penetrate the blood brain barrier. In this manner, NMO could be initiated within 3 to 4 days of an influenza immunization." *Id.*

Dr. Steinman also referred to the Schonberger article to support his opinion that neuroinflammation can occur one day after vaccination. Pet'r. Ex. 38 at 6. He stated that, "If the immune response includes high affinity antibodies and/or memory T cells cross-reactive to a myelin component, then the timing of NMO within one to three days is supported by the actual data from Schonberger." Pet'r. Ex. 36 at 7.

Dr. Sriram accepted 12 to 14 days as a reasonable timeframe for onset of an autoimmune condition to link to a vaccination. Tr. 241. Dr. Forsthuber opined that a memory immune response (recall response) to a vaccine could occur within five to ten days post-vaccination but disagreed with Dr. Steinman that a two- or three-day onset of symptoms could occur based on a recall response. Tr. 376-78. Dr. Forsthuber testified that the Bartholomaus et al. article

39

demonstrates that at the earliest immune response, even being a recall response, could not occur earlier than five days after a vaccination. Resp't. Ex. L.[20] The article described how T cells invade the central nervous system tissue, entering through the "Virchow-Robinspaces around the radial vessels that dive into the spinal cord parenchyma. Submeningeal and perivascular efforts T-cells invade the adjacent CNS parenchyma-a process that coincided with the onset of clinical symptoms on day 3 after transfer." Resp't. Ex. L at 2. The authors wrote, "One day later, at the peak of disease symptoms, the effector T cells were found dispersed throughout the white and grey spinal cord matter." *Id.* Even with the direct infusion of autoreactive T cells, it took approximately three days for the T-cells to penetrate into the CNS and result in neurological symptoms.

The undersigned finds that respondent's position in this matter is more persuasive. First, the medical literature describing the onset of NMOSD after vaccination does not support a one-day onset. The Nakamura case report described a pediatric patient developing NMOSD symptoms three days after testing positive for influenza. Pet'r. Ex. 25 at 1.[21] Janius also described the onset of AQP4-antibody positive NMO symptoms in a patient two weeks after vaccination for diphtheria, tetanus, pertussis, polio, and influenza. Resp't. Ex. C, Tab 4 at 13. The authors wrote that the onset of symptoms two weeks post-vaccination was "within a time window considered to be compatible with a post-vaccination reaction." *Id.* The Cho case report described a patient developing NMOSD symptoms three days after receiving the flu vaccine. Pet'r. Ex. 48(a) at 3.

Indeed, prior program cases generally do not support a one-day onset of a central nervous system injury as medically acceptable. *See Jagoe v. Sec'y of Health & Hum. Servs.,* No. 08-678V, 2012, WL 13036265, at \*27-28 (Fed. Cl. Spec. Mstr. Aug. 3, 2012) (finding that a 24-hour onset of symptoms of transverse myelitis was not medically appropriate to infer causation); *Rowan v. Sec'y of Health & Hum. Servs.,* No. 17-760V, 2020 WL 2954954, at \* 16-18 (Fed. Cl. Spec. Mstr. Apr. 28, 2020) (finding that a 30–36-hour onset of GBS based on a post-vaccination recall response to previously encountered antigens was not medically acceptable); *Forrest v. Sec'y of Health & Hum. Servs.,* No. 14-1046V, 2019 WL 925495, at \*3-8 (Fed. Cl. Spec. Mstr. Jan. 28, 2019) (finding that a 36-hour onset of transverse myelitis following a recall response triggered by the flu vaccination was not medically acceptable); *Palattao v. Sec'y of Health & Hum. Servs.,* No. 13-591 V, 2019 WL 989380, at \*35 (Fed. Cl. Spec. Mstr. Feb. 4, 2019) (citing dismissals of cases within 24-huour onset for vaccine related transverse myelitis and finding a 30 to 36-hour onset to not be medically acceptable); *Brancheau v. Sec'y of Health & Hum. Servs.,* No. 21-1209, 2024 WL 1619606, at \*23-26 (Fed. Cl. Spec. Mstr. Mar. 21, 2024) (finding onset of transverse myelitis one day after the flu vaccine to be too close to be medically reasonable); *Greenslade v. Sec'y of Health & Hum. Servs.,* No. 14-1140V, 2024 WL 3527665, at \*40-41 (Fed. Cl. Spec. Mstr. June 28, 2014) (finding a 24-hour onset of transverse myelitis after the Tdap vaccine too soon to be considered medically acceptable); *Mosley v. Sec'y of Health & Hum. Servs.,* No. 08-724Vm 2015 WL 2354316, at \*19 (Fed. Cl. Spec. Mstr. Apr. 27, 2015)

---

[20] Bartholomaus, I. et al., *Effector T-cell Interactions with Meningeal Vascular Structures in Nascent Autoimmune CNS Lesions,* 462 Nature 94-98 (2009). [Resp't. Ex. L].

[21] Nakamura, Y. et al., *Influenza-Associated Monophasic Neuromyelitis Optica,* 50 Intern. Med. 1605-1609 (2011). [Pet'r. Ex. 25].

(denying compensation where onset of transverse myelitis occurred one day after tetanus vaccination because it was too soon to support vaccine causation).

Among the Vaccine Program cases involving vaccines and diseases affecting the central nervous system where petitioners have prevailed, medically accepted timeframe were found to be five days and 30 days. *See Calise v. Sec'y of Health & Hum. Servs.,* No. 08-865V, 2011 WL 1230155, at *28 (Fed. Cl. Spec. Mar. 14, 2011) (finding the onset of pain and aching 23 days post-vaccination to be an appropriate temporal relationship for causation); *Farrell v. Sec'y of Health & Hum. Servs.,* No. 19-301V, 2025 WL 2409187, at * 8-9 (Fed. Cl. Spec. Mstr. July 29, 2025) (finding an onset of neuromyelitis optica 21 days after the Tdap vaccine was an acceptable timeframe); *see also White v. Sec'y of Health & Hum. Servs.,* No. 15-1521V, 2019 WL 7563239, at * 26 (Fed. Cl. Spec. Mstr. Dec. 19, 2019) (finding the onset of transverse myelitis 27 days post-vaccination an acceptable timeframe to infer vaccine causation).

The undersigned has accepted an onset of symptoms approximately forty hours after vaccination as medically appropriate based on a recall response in *Quakenbush-Baker.* *Quackenbush-Baker,* No. 14-1000V, 2018 WL 1704523, at *23 (Fed. Cl. Spec. Mstr. Mar. 14, 2018). In *Quackenbush-Baker,* I found that the Bartholomaus study, which both Drs. Steinman and Forsthuber referenced in this case, was persuasive in demonstrating that a recall T-cell response can reach the central nervous system within forty hours after vaccination, causing neurological symptoms. *Id.* at *20. The facts in this case are different than in *Quakenbush-Baker,* where the onset of neurological symptoms appeared forty-hours after vaccination, and the undersigned found that the vaccine likely caused an aggravation of already forming lesion. Whereas in this case, petitioner's symptoms began one day after vaccination and petitioner did not have pre-existing lesions making her blood brain barrier easily permeable by circulating memory T-cells.

Thus, I conclude that a one-day onset is too fast for a new onset of NMOSD and for that reason have concluded that it is unlikely that the flu vaccine was the cause of her condition. Petitioner is, therefore, unable to prove *Althen* prong three.

### V. Conclusion

For the reasons discussed above, the undersigned finds that petitioner has failed to establish by preponderant evidence that the flu vaccine she received on October 8, 2014 was the cause-in-fact of her NMOSD. Therefore, petitioner is not entitled to compensation, and the petition must be dismissed.

In the absence of a timely filed motion for review pursuant to Vaccine Rule 23, the Clerk of the Court **SHALL ENTER JUDGMENT** in accordance with this decision.

**IT IS SO ORDERED.**

<u>**s/Thomas L. Gowen**</u>
Thomas L. Gowen
Special Master

41